UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.

No. 88 Civ. 4486 (DNE).

United States District Court,
S.D. New York.

Nov. 8, 1996.

Mary Jo White, United States Attorney, S.D.New York (Beth E. Goldman and Karen B. Konigsberg, of counsel), for the Government.

Sullivan & Cromwell, New York City (Michael A. Cooper and Robin D. Fessel, of counsel), for non-party Labatt Brewing Co., Ltd.

## OPINION & ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America ("the Government") against, *inter alia,* defendant International Brotherhood of Teamsters ("the IBT" or "the Union") and the IBT's General Executive Board. The settlement is embodied in the voluntary consent order entered March 14, 1989 ("Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through a two-phased implementation of the Consent Decree's various remedial provisions. In the first phase of the Consent Decree, these provisions provided for three court-appointed officers: the Independent Administrator to oversee the Consent Decree's provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to supervise

the electoral process that led up to and included the 1991 election for International Union Office. In the second phase of the Consent Decree, the Independent Administrator was replaced by a three-member Independent Review Board ("the IRB"), but the position of Election Officer remained unchanged.

The Government brings the instant action against non-party Labatt Brewing Company Limited ("Labatt"), a corporation organized under the laws of Canada with its principal place of business in Toronto. (Memorandum of Labatt Brewing Company Limited in Opposition to the Government's Application for an Order Directing It to Permit Union Electioneering on Premises in Canada, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Labatt's Memo"), at 1 (Nov. 5, 1996).) This action arises from Labatt's refusal to abide by a decision of the Election Officer issued October 17, 1996, and affirmed by the Election Appeals Master on October 26, 1996, requiring Labatt "to permit campaigning in the parking lot where IBT members park their personal vehicles...." (Decision of the Election Officer, Election Office Case No. P–942–LAB–CAN ("E.O. Decision"), at 3 (Oct. 17, 1996).) Pursuant to the Consent Decree and the Rules for the 1995–1996 IBT International Union Delegate and Officer Election ("the 1996 Election Rules"), the Government moves this Court for an order directing Labatt to comply with the Election Officer's decision, and, if Labatt fails to comply with such order, a subsequent order holding Labatt in civil contempt. (Government's Memorandum of Law in Support of its Motion for an Order of Civil Contempt, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Govt.'s Memo"), at 1 (Nov. 1, 1996).) In response, Labatt counters that this Court has no personal jurisdiction over it, that Consent Decree case law is inapplicable to the present dispute, and that ordering Labatt to comply with the Election Officer's decision would violate the international-law principle of comity. (Labatt's Memo at 2–7.) After reviewing papers submitted by the Government and Labatt respectively, and considering the arguments put forth by each at oral argument, this Court finds that it has personal jurisdiction over Labatt for purposes of the instant matter, and that the Government's motion should be granted.

## BACKGROUND

On Friday, November 1, 1996, the Government applied to this Court for an order directing Labatt to appear before this Court

> to show cause why the Court should not enter an order, pursuant to, *inter alia,* its continuing supervisory jurisdiction over implementation of the Consent Decree, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers, (i) directing Labatts to comply fully, within twenty-four hours, with the October 17, 1996 decision of the Election Officer in Election Case No. P–942–LAB–CAN, by allowing Mr. Hoffa, and/or any other non-employee IBT members to have access for campaign purposes to the parking lot at Labatts' facility in LaSalle, Quebec, Canada where IBT members park their personal vehicles; (ii) in the event of Labatts' failure to take the actions directed in (i) above, adjudging Labatt in civil contempt ...; (iii) awarding the Government and the Election Officer such other and further relief as the Court deems just and proper ...

(Order to Show Cause, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (Nov. 1, 1996) ("November 1 Order"), at 2.) In support of its application, the Government submitted a memorandum of law and exhibits explaining the facts underlying the instant motion.

According to the Government, Labatt "has violated the Rules for the 1995–1996 IBT International Union Delegate and Officer Election by preventing Mr. James P. Hoffa ("Hoffa"), an IBT member and candidate for IBT General President, from gaining campaign access to a parking lot at a Labatt facility in LaSalle, Quebec, Canada." (November 1 Order at 1.) Under the 1996 Election Rules, IBT members and candidates have a limited, rebuttable right of access to distribute literature and seek support for their campaigns in parking lots used by union members to park their cars at their

places of employment. (Govt.'s Memo at 2); (Rules for the 1995–1996 IBT International Union Delegate and Officer Election, Art. VIII, § 11(e).) The Government explains that Labatt denied Hoffa and other IBT members campaign access to the parking lot at the Labatt facility in question, and that Labatt removed Hoffa from the Labatt employee parking lot. (Govt.'s Memo at 2.) The Government maintains that "Labatt did not attempt to demonstrate that access to its employee parking lot was neither necessary nor appropriate to meaningful exercise of democratic rights in the course of the 1996 IBT election pursuant to Article VIII, Section 11(e) of the Election Rules." *Id.* Instead, Labatt asserted only that Rule 11 conflicts with Labatt's safety regulations, and that Labatt is not bound by the Election Rules. *Id.* at 2 & Ex. F.

Hoffa filed an election protest regarding this matter with the Election Officer appointed by this Court to oversee the 1995–1996 IBT Election. *Id.* at 2; (E.O. Decision at 1.) In a decision dated October 17, 1996, the Election Officer granted Hoffa's protest and directed Labatt to comply with the Election Rules and "to permit campaigning in the parking lot where IBT members park their personal vehicles, in conformity with Article VIII, Section 11(e) of the Rules." (E.O. Decision at 3.) The Election Appeals Master affirmed this decision on October 26, 1996. (Decision of the Election Appeals Master, *In re: James P. Hoffa and Labatt Breweries,* 96–Elec. App. 259 (KC) (Oct. 26, 1996) ("E.A.M. Decision").) This Court's review of these two decisions indicates that Labatt appeared before neither the Election Officer nor the Election Appeals Master. *See* (E.O. Decision); (E.A.M. Decision at 1).

The Government asserts that Labatt has failed to seek and obtain a stay of the Election Officer's decision, and that Labatt has refused to comply with the Election Officer's order. (Govt.'s Memo at 3 & Ex. F.) The Government thus seeks an order from this Court directing Labatt to comply with the Election Officer's decision, and, if Labatt fails to comply with such order, a subsequent order holding Labatt in civil contempt. *Id.* at 1; (November 1 Order at 1.) The Govern-

ment moved this Court by Order to Show Cause because mailing of the ballots for the 1996 IBT Election was scheduled to begin Thursday, November 7, 1996, and the Government seeks to obtain relief as soon as possible given the short time remaining for campaign activities in connection with the IBT election. (November 1 Order at 1–2.)

This Court signed the Order to Show Cause on November 1, 1996, and ordered that the Government serve the Order to Show Cause and its supporting papers on Labatt in Quebec, Canada in accordance with the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965 ("the Hague Service Convention"). *Id.* at 3. This Court further ordered the Government and Labatt to appear for oral argument on this matter on Monday, November 4, 1996. *Id.*

In compliance with this Court's November 1 Order, both the Government and Labatt appeared before this Court on November 4, 1996. Although this Court heard argument from each regarding the question whether this Court has subject matter jurisdiction over Labatt, this Court adjourned the hearing to provide Labatt additional time to prepare and submit papers on this issue to this Court. (Hearing, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Nov. 4 Tr."), 14 (Nov. 4, 1996).) This Court then ordered Labatt to serve and file its papers by Tuesday, November 5, 1996, the Government to file a response to Labatt's papers by Wednesday, November 6, 1996, at 10:00 a.m., and both Labatt and the Government to appear before this Court for further argument on Wednesday, November 6, 1996, at 10:00 a.m. *Id.* at 14–15.

The Government and Labatt properly served and filed their respective papers as ordered by this Court. At oral argument, this Court requested that both participants address the legal bases of their respective positions, the facts upon which they based these positions, and the applicability of Federal Rule of Civil Procedure 4(k)(2) ("Rule 4(K)(2)") to the instant matter.

## DISCUSSION

Since the Consent Decree's inception, this Court has been inundated with litigation regarding the application and interpretation of the Consent Decree and the role of the officers appointed by this Court to oversee the Consent Decree's provisions. This Court has labored tirelessly to resolve every one of these legal challenges. Moreover, this Court repeatedly has been called upon to reconsider issues of Consent Decree law long since resolved by both this Court and the Second Circuit. As a result of constantly revisiting these well-settled issues, recent decisions emanating from the Consent Decree bear closer resemblance to history lessons on the IBT than they do to innovative legal analyses. The instant matter, however, presents a welcome opportunity for this Court to break this pattern, for it presents not one, but two, novel issues for this Court's consideration: (1) this Court's power to exercise personal jurisdiction over a foreign corporation for purposes of enforcing the Consent Decree; and (2) the applicability of the Consent Decree in a foreign jurisdiction. Because the exercise of personal jurisdiction over Labatt is a prerequisite to this Court's consideration of the substantive legal issues at bar, this Court will address the jurisdictional issue first.

### I. Personal Jurisdiction

Both at oral argument and in the papers it submitted to this Court, the Government asserts that this Court has personal jurisdiction over Labatt. It provides this Court two bases for this assertion. First, the Government relies on a principle of international law known as the "effects doctrine." (Nov. 4 Tr. 6–9); (Government's Supplemental Memorandum of Law in Support of its motion for an Order of Civil Contempt, *United States v. International Bhd. of Teamsters*, 88 Civ. 4486 ("Govt.'s Supp. Memo"), at 2 (Nov. 6, 1996).) According to the Government, the *Restatement (Third) of Foreign Relations Law* ("the *Restatement*") expressly provides that a court may exercise jurisdiction over a person "if at the time jurisdiction is asserted . . . the person, whether natural or judicial, had carried on outside the state an activity having a substantial, direct, and foreseeable effect within the state, but only in respect to such activity." *Id.*, at 2 (quoting *Restatement (Third) of Foreign Relations Law* § 421(2)(j) (1987)). The Government asserts that the Second Circuit repeatedly has endorsed the *Restatement* principle "that actions outside the state with effects within the state constitute a sufficient basis for personal jurisdiction," *id.*, in order to support a district court's exercise of personal jurisdiction over a foreign defendant. *Id.* at 3–4.

The Government contends that the effects doctrine supports this Court's exercise of personal jurisdiction over Labatt in the instant case. *Id.* It states that "Labatt's refusal to permit limited access to its property, in violation of the Election Rules, interferes with the comprehensive and uniform process governing the IBT election throughout the United States and Canada, and, in so doing, interferes with the effort by the United States to rid the IBT of Corruption and the influence of organized crime." *Id.* at 5. The Government further asserts that this consequence is a "substantial, direct and foreseeable effect" of Labatt's actions, and that Labatt concedes this fact. *Id.* at 4.

Alternatively, the Government suggests that "Labatt is subject to the jurisdiction of this Court for the further reason that it is doing business in the United States and in New York State." *Id.* at 7. The Government maintains that under New York state law "a foreign parent corporation that does not directly do business in the United States may be amenable to personal jurisdiction if the subsidiary does business here." *Id.*

The Government explains that Labatt has a subsidiary in the United States, Labatt U.S.A., located in Darien, Connecticut. (Declaration of Assistant United States Attorney Karen B. Konigsberg, *United States v. International Bhd. of Teamsters*, 88 Civ. 4486, ¶ 11 (Nov. 1, 1996).) It states that this subsidiary is incorporated in Delaware, and conducts business in both the United States and New York state. *Id.*; (Govt.'s Supp. Memo at 8–10 & Ex. E). The Government asserts that statements by Labatt's employees concede that Labatt U.S.A. conducts business in both jurisdictions, and that La-

batt owns 70% of Labatt U.S.A. (Govt.'s Supp. Memo at 8); (Affidavit of James West, Director of Legal Services, Canada, and Assistant Secretary of Labatt Brewery Ltd., *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("West Aff."), ¶ 3 (Nov. 1, 1996).) In addition, the Government submits several exhibits which it claims "confirm that Labatt is doing business in the United States through its United States subsidiary," (Govt.'s Supp. Memo at 8), such as: (1) a copy of Labatt's site on the World Wide Web which contains a page devoted to "Labatt in the United States," *id.* at Ex. A; (2) Labatt's 1994 Annual Report stating that Labatt U.S.A. is a "division" of the company which "competes in the high-quality segment of the United States beer business," *id.* at Ex. B; and (3) evidence that Labatt U.S.A. is qualified to do business in New York, and maintains an agent for service of process in New York State. *Id.* at Ex. E.

Based on this documentation, the Government concludes that "Labatt's purposeful conduct of business in the United States and New York through a United States subsidiary constitutes 'continuous and systematic' contacts with the United States and New York." *Id.* at 10. Accordingly, the Government argues that "it is entirely consistent with the notions of fair play and justice for this Court to exercise its jurisdiction over Labatt to order compliance with the Election Rules and the Election Officer's order." *Id.*

In response to this Court's request, the Government addressed the applicability of Rule 4(k)(2) to the instant dispute. The Government stated that Rule 4(k)(2) is applicable to the instant case, and that it empowers this Court to exercise personal jurisdiction over Labatt. (Hearing, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (Nov. 6, 1996) ("Nov. 6 Tr."), 5–6.) The Government explained that Rule 4(k)(2) demands that a foreign defendant have sufficient contacts with the United States to satisfy constitutional due process requirements, and that three possible bases exist for satisfying these requirements: (1) transacting business in the United States; (2) doing an act in the United States; and (3) having an effect in the United States by an act done elsewhere. *Id.* at 5.

Referring to its earlier arguments, the Government stated that Labatt both has transacted business in the United States and caused an effect in the United States by an act done elsewhere. *Id.* at 5–6. Accordingly, the Government concluded that Labatt has sufficient contacts with the United States to support this Court's exercise of personal jurisdiction over Labatt, and that such exercise would comport with traditional notions of fair play and substantial justice, pursuant to the requirements of Rule 4(k)(2). *Id.* at 6.

Labatt contests the Government's assertion that this Court has personal jurisdiction over it, and raises three claims in opposition to the Government's arguments. First, Labatt states that "there is absolutely no basis for the Court's exercise of personal jurisdiction over Labatt." (Labatt's Memo at 1.) Labatt explains that it is a corporation organized under the laws of Canada with its principal place of business in Toronto, engaged in the business of brewing and selling beer. *Id.* Labatt operates several breweries in Canada, including the facility in La-Salle, Quebec that is the focus of the instant dispute. *Id.* It further states that it "conducts no business in the United States and has no property or employees here," but that "Labatt's beer is sold in the United States by a partially owned subsidiary, which takes title to the beer at the breweries in Canada." *Id.* at 1–2. In addition, Labatt affirms to this Court that it does not advertise, solicit business, sell goods or otherwise conduct business, own property, hold bank accounts, or have employees in the United States. (West Aff. ¶¶ 2–5.) Based on these facts, Labatt contends that it lacks sufficient " 'minimum contacts' with the forum state so that the assertion of personal jurisdiction ... is consistent with 'traditional notions of fair play and substantial justice.' " (Labatt's Memo at 2.)

Second, Labatt contends that case law cited by the Government in support of its case fails to support this Court's exercise of personal jurisdiction over Labatt. *Id.* Labatt explains that two of the Government's cited cases—*United States v. International Bhd. of Teamsters [Yellow Freight],* 948 F.2d 98 (2d Cir.1991), *vacated with directions to dis-*

*miss as moot,* 506 U.S. 802, 113 S.Ct. 31, 121 L.Ed.2d 4 (1992), and *United States v. International Bhd. of Teamsters [Star Market],* 954 F.2d 801 (2d Cir.) *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992)—address Consent Decree jurisdictional issues entirely unrelated to that at bar. *Id.* at 3; (Nov. 6 Tr. 8.) Labatt declares that *Yellow Freight* "held only that the All Writs Act gives this Court power to enforce the 1989 Consent Decree against non-parties if the Court has personal jurisdiction over the non-party." (Labatt's Memo at 3.) It further professes that "the only issue in *Star Market* was whether the Court had nationwide jurisdiction to enforce the 1989 Consent Decree" on a non-party that "indisputably has substantial United States contacts." *Id.* at 3–4.

Third, Labatt argues that the Government's reliance on the "effects doctrine" is misplaced. It contends that the cases cited by the Government in support of this doctrine arose from criminal proceedings, that "there is no allegation of any criminal conduct nor that any law of the United States had been violated" in the instant case, and that, therefore, the effects doctrine is inapplicable. *Id.* at 4–6; (Nov. 6 Tr. 9.)

As for Rule 4(k)(2), counsel for Labatt was entirely unfamiliar with both the provision and its interpretive case law. (Nov. 6 Tr. 12–13.) After listening to the Court read Rule 4(k)(2), however, he attempted to fashion a response by boldly asserting that "Rule 4(k)(2) does not add anything" to the instant inquiry, and that "there is nothing in Rule 4(k)(2) that diminishes the minimum-contacts test." *Id.*

It is a basic principle of first-year civil procedure that questions of personal jurisdiction go to "whether the controversy or defendant has sufficient contact with the forum to give the court the right to exercise judicial power over defendant...." *Santos v. State Farm Fire and Cas. Co.,* 902 F.2d 1092, 1095 (2d Cir.1990). Plaintiff bears the burden of establishing a district court's personal jurisdiction over defendant, but his burden varies depending on the procedural posture of the litigation. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 196–97 (2d Cir.

1990): "Prior to discovery, a plaintiff challenged by a jurisdictional testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction." *Id.* at 197. At such preliminary stage, plaintiff's *prima facie* showing may be met solely by allegations, the truth of which must be assumed by the district court. *Id.*

In light of this standard, the positions advanced by both the Government and Labatt, and relevant case law, this Court finds that it is proper to exercise personal jurisdiction over Labatt in the instant case, pursuant to Rule 4(k)(2). For the benefit of Labatt's counsel, this Court will explain the Rule itself and review the legal principles underlying it before explaining its applicability to the case at bar.

### A. Rule 4(k)(2)

Rule 4(k)(2) is a relatively new provision of the Federal Rules of Civil Procedure. As amended in 1993, Rule 4(k)(2) provides that

> [i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed.R.Civ.P. 4(k)(2).

According to its legislative history, Rule 4(k)(2) was intended to be a narrow extension of federal jurisdiction to fill a "gap" in the enforcement of federal law:

> Under the former rule, a problem was presented when the defendant was a nonresident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation.... In such cases, the defendant was shielded from the enforcement of federal law by the fortuity of a favorable limitation on the power of state courts, which was incorpo-

rated into the federal practice by the former rule.

Fed.R.Civ.P. 4(k)(2), advisory committee's notes (1993). Congress adopted the 1993 Amendment to Rule 4 following the suggestion of the Supreme Court in *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987), that

> [a] narrowly tailored service of process provision, authorizing service on an alien in a federal-question case when the alien is not amenable to service under the applicable state long-arm statute, might well serve the ends of ... federal statutes.

*Id.* at 111, 108 S.Ct. at 413; *see* 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1069 (Supp. 1995).

■ A court faced with the question whether it is appropriate to exercise personal jurisdiction under Rule 4(k)(2) must undertake a two-part inquiry. *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81, 87 (S.D.N.Y.1995). First, the court must determine whether the Rule is applicable by discerning that: (1) the case arises under federal law, and is not pending before the court pursuant to the court's diversity jurisdiction, *United Trading Co. S.A. v. M.V. Sakura Reefer*, No. 95 Civ. 2846, 1996 WL 374154, at *3 (S.D.N.Y. July 2, 1996); *Eskofot*, 872 F.Supp. at 87; 4 Wright & Miller, § 1069; and (2) that the foreign defendant lacks sufficient contact with any single state to subject it to personal jurisdiction there. *See Pharmachemie B.V. v. Pharmacia S.p.A.*, 934 F.Supp. 484, 488 (D.Mass.1996); *Eskofot*, 872 F.Supp. at 87; *Nissho Iwai Corp. v. M/V Star Sapphire*, No. Civ. A. H–94–1599, 1995 WL 847172, at *3 (S.D.Texas Aug. 24, 1995); *Pacific Employers Ins. Co. v. M/T Iver Champion*, Civ.A. No. 91–0911, 1995 WL 295293, at *5 (E.D.La. May 11, 1995); 4 Wright & Miller, § 1069. Then, the court must scrutinize plaintiff's allegations to ascertain whether plaintiff has demonstrated that defendant has sufficient aggregate contacts with the United States to comport with constitutional notions of due process. *Pharmachemie B.V.*, 934 F.Supp. at 488; *Eskofot*, 872 F.Supp. at 87; *Nissho Iwai*, 1995 WL 847172, at *3.

Commentators note that "by and large the preponderance of cases in the federal courts raising jurisdiction questions [pursuant to Rule 4(k)(2) ] in recent years have involved corporations." 4 Wright & Miller, § 1069. In fact, Judge Leisure recently had occasion to consider the applicability of Rule 4(k)(2) to a foreign, corporate defendant in *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F.Supp. 81 (S.D.N.Y.1995), a decision instructive in the instant case.

### B. *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*

In *Eskofot*, plaintiff Eskofot, a Danish manufacturer of printing equipment, brought a civil antitrust suit against E.I. Du Pont De Nemours, an American corporation, and Du Pont U.K. Limited ("Du Pont U.K."), its British subsidiary, pursuant to various provisions of the Sherman Act. *Id.* at 83. Specifically, plaintiff alleged that Du Pont U.K. engaged in anticompetitive behavior abroad that prevented plaintiff from marketing its products in the United States. *Id.* at 83–85. Plaintiff also alleged, and defendant did not deny, that in connection with products at the center of the antitrust dispute, Du Pont U.K. had participated in trade shows in the United States, engaged in other marketing efforts in the United States, and sent its employees to travel in the United State to assist with product testing. *Id.* at 88.

Defendant Du Pont U.K. moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), *id.* at 83, on grounds that it lacked the minimum contacts necessary to support an exercise of jurisdiction by the district court. *Id.* at 88. In support of this motion, Du Pont U.K. claimed that it conducted no business in the United States, had no office or employees in the United States, was not licensed to conduct business in the United States by any state, maintained no bank accounts, books, or records in the United States, and filed no tax returns in the United States. *Id..*

Plaintiff proffered several theories in support of its claim that the district court had personal jurisdiction over Du Pont U.K. *Id.* at 86. Judge Leisure found, however, that

personal jurisdiction existed over the British subsidiary, pursuant to Rule 4(k)(2), and that it therefore was unnecessary to analyze any of plaintiff's other jurisdiction theories. *Id.* Judge Leisure explained that "Rule 4(k)(2) only provides federal courts with personal jurisdiction over a foreign defendant in federal question cases and only if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." *Id.* at 87. In order to determine whether a defendant has "minimum contacts with the United States at large," Judge Leisure looked to the Second Circuit for guidance:

> [t]he Second Circuit has addressed the question of what activities of a foreign corporation satisfy the minimum contacts test and has listed the following factors for meeting the standard: (1) transacting business in the United States, (2) doing an act in the United States, or (3) having an effect in the United States by an act done elsewhere.

*Id.* at 87 (citing *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972)).

Turning to the third factor first, Judge Leisure held that "personal jurisdiction may be asserted by courts where a foreign corporation, through an act performed elsewhere, causes an effect in the United States." *Id.* (citing *Securities and Exchange Comm'n v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir. 1990)). As previously mentioned, plaintiff alleged that Du Pont U.K. engaged in anticompetitive behavior abroad that prevented plaintiff from marketing its products in the United States. *Id.* at 83–85. Assuming plaintiff's allegations were true, Judge Leisure concluded that "the consequences which have been caused by defendants' conduct are sufficient to subject defendants to this Court's jurisdiction." *Id.* at 88.

### C. Personal Jurisdiction over Labatt

Turning to the case at hand, this Court finds that Rule 4(k)(2) is applicable to the instant case, and that it supports this Court's exercise of personal jurisdiction over Labatt.

### 1. Applicability of Rule 4(k)(2)

As an initial matter, this Court finds that the present dispute arises under this Court's federal-question jurisdiction, *see* 28 U.S.C. § 1331, and that Labatt "is not subject to the jurisdiction of the courts of general jurisdiction of any state." Fed.R.Civ.P. 4(k)(2).

### a. The action arises under federal law

■ The Government's claim against Labatt arises under federal law. As previously stated, the Government seeks enforcement of a decision rendered by the Election Officer against Labatt regarding the application of the 1996 Election Rules. (Govt.'s Memo at 1.) The Election Officer rendered her decision against Labatt pursuant to the authority vested in her by the 1996 Election Rules and the Consent Decree. *See* Stipulation & Order Implementing Paragraph 12(D)(ix) of the March 19 [sic], 1989 Consent Decree, ¶ 3(c) (S.D.N.Y. Feb. 7, 1995). The Consent Decree resolved a litigation brought by the Government against the IBT pursuant to the Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1965(d), a federal racketeering statute. Because the Government's application both arises from this underlying RICO prosecution and seeks to enforce the settlement terms of this RICO prosecution, this Court finds that the instant application arises under federal law.

### b. Labatt is beyond the reach of this Court's long-arm jurisdiction

■ This Court further finds that Labatt "is not subject to the jurisdiction of the courts of general jurisdiction of any state." Fed.R.Civ.P. 4(k)(2). Both commentators and case law explain that, prior to the 1993 amendment to Rules 4(k)(2), "the jurisdiction of a federal court, even in federal question cases, in the absence of a statutory provision for service was limited by the forum state's long-arm statute...." 4 Wright & Miller § 1069; *see Pharmachemie B.V.,* 934 F.Supp. at 488; *Nissho Iwai,* 1995 WL 847172, at *2. In the absence of Rule 4(k)(2) or another statutory provision for service, this Court's personal jurisdiction in the instant case would be limited by New York state jurisdictional statutes. *Mareno v.*

*Rowe,* 910 F.2d 1043, 1046 (2d Cir.1990); *Marsh v. Kitchen,* 480 F.2d 1270, 1272 & n. 6 (2d Cir.1973). In this case, the relevant provisions are New York Civil Practice Law and Rules ("CPLR"), Sections 301 and 302. *See Stratagem Dev. Corp. v. Heron Int'l N.V.,* 153 F.R.D. 535, 545 (S.D.N.Y.1994).

### i. Personal jurisdiction pursuant to New York CPLR § 301

▉▉▉ Under CPLR Section 301, a corporation "is amenable to jurisdiction in New York if it is 'doing business' in New York so as to establish its presence in the state." *Mareno,* 910 F.2d at 1046; *Stratagem,* 153 F.R.D. at 545. A corporation is said to be "doing business" in New York if it engages in "a continuous and systematic course of conduct in New York." *Mareno,* 910 F.2d at 1046; *Beacon Enter., Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983).

▉▉▉ The New York courts have enumerated various factors to consider when determining whether a foreign corporation engages in a "continuous and systematic course of conduct in New York." For example, having minimum contacts within the state, such as bank accounts, employees, ownership of leases on real property, public relations and publicity work, or sales within the state, constitutes the requisite level of conduct to justify a New York court's exercise of jurisdiction over a defendant. *Vendetti v. Fiat Auto S.p.A.,* 802 F.Supp. 886, 890 (W.D.N.Y. 1992); *Laufer v. Ostrow,* 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982). Jurisdiction also may be acquired over a foreign corporation if a parent-subsidiary relationship is present between a New York corporation and a foreign corporation and there is a valid agency relationship between the two companies. *International Customs Assocs. v. Ford Motor Co.,* 893 F.Supp. 1251, 1262 n. 9 (S.D.N.Y.1995); *Vendetti,* 802 F.Supp. at 890. Similarly, "[w]here a wholly-owned subsidiary is present in New York, a New York court may exercise personal jurisdiction over the parent if the latter's 'control over the subsidiary's activities [is] so complete that the subsidiary is, in fact, merely a department of the parent.'" *Stratagem,* 153 F.R.D. at 546 (quoting *Katz Agency, Inc. v.*

*Evening News Ass'n,* 514 F.Supp. 423, 428 (S.D.N.Y.1981)); *Ford Motor Co.,* 893 F.Supp. at 1262 n. 9; *Vendetti,* 802 F.Supp. at 890. The relevant time for a jurisdictional inquiry under New York CPLR Section 301 is at the time the summons and complaint are filed. *Vendetti,* 802 F.Supp. at 890.

The facts and documentation presented by the Government, which this Court assumes as true for purposes of the instant inquiry, *Ball,* 902 F.2d at 197, demonstrate that Labatt is not "doing business" in New York "with a fair measure of permanence and continuity." *Beacon Enters., Inc.,* 715 F.2d at 762. The Government has not asserted that Labatt has minimum contacts within the state of New York, such as bank accounts, employees, ownership of leases on real property, public relations and publicity work, and sales within the state. *Vendetti,* 802 F.Supp. at 890. Moreover, Labatt itself has denied the existence of several of these items. (West Aff. ¶¶ 2–5 (denying that Labatt advertises, solicits business, sells goods, conducts business, owns property, holds bank accounts, or has employees in the United States).) In addition, the Government has not claimed that a valid agency relationship exists between Labatt and Labatt U.S.A. Similarly, the Government has failed to establish that Labatt's United States subsidiary meets the prerequisites for finding that it is a "mere department" of Labatt. In fact, the evidence before this Court demonstrates that Labatt U.S.A. is not even "wholly-owned" by Labatt. (West Aff. ¶ 3.) Consequently, this Court finds that CPLR Section 301 does not support the exercise personal jurisdiction over Labatt in the instant case.

### ii. Personal jurisdiction pursuant to New York CPLR § 302

▉▉▉ The New York long-arm statute provides for jurisdiction over non-domiciliary defendants in certain circumstances:

As to causes of action arising from any acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an

agent .... transacts any business within the state ...

N.Y. CPLR § 302(a)(1).

Under this provision, two conditions must be met for a court to exercise personal jurisdiction over a non-domiciliary defendant: (1) the defendant must "transact business" in New York; and (2) the claim against defendant must arise out of that business activity. *Ford Motor Co.*, 893 F.Supp. at 1259. It is clear to this Court that the second of these two elements is missing in the instant case. The Government's claim against Labatt arises out of Labatt's refusal to allow IBT members to access certain property at a manufacturing facility in Quebec, Canada. Assuming *arguendo* that Labatt did "transact business" in New York, the Government's claim is wholly unrelated to any sale, distribution, advertising, or other business that Labatt possibly could transact within the state of New York. Accordingly, this Court finds that the New York long-arm statute provides no basis for exercising jurisdiction over Labatt in the instant case.

*2. Constitutional due process requirements of Rule 4(k)(2)*

Having established that Rule 4(k)(2) is applicable to the instant case, this Court turns to the question whether the Government has met its burden of demonstrating that Labatt has the requisite aggregate contacts with the United States to satisfy constitutional due process requirements. *Eskofot*, 872 F.Supp. at 87. Despite Labatt's counsel's assertion that "Rule 4(k)(2) does not add anything" to a court's minimum contacts analysis, (Nov. 6 Tr. 12), case law reveals otherwise.

Pursuant to Rule 4(k)(2), a defendant "must have at least minimum contacts with the United States at large," *id.*, not with the forum state, *Nissho Iwai*, 1995 WL 847172, at *2, in order for a court's exercise of personal jurisdiction over defendant to comport with "traditional notions of fair play and substantial justice." *Eskofot*, 872 F.Supp. at 87; *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987). As Judge Leisure explained in *Eskofot*, the Second Circuit has listed three types of actions by which a foreign corporation may satisfy the minimum contacts test: (1) transacting business in the United States; (2) doing an act in the United States; or (3) having an effect in the United States by an act done elsewhere. 872 F.Supp. at 87 (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir.1972)). As the above discussion makes clear, Labatt neither is transacting business in the United States, nor has it done an act in the United States that would subject it to jurisdiction in the instant case. Labatt has, however, caused an effect in the United States though an act performed in Canada.

It is an elementary principle of international law that a court may exercise jurisdiction over a person "if at the time jurisdiction is asserted ... the person, whether natural or judicial, had carried on outside the state an activity having a substantial, direct, and foreseeable effect within the state, but only in respect to such activity." *Restatement (Third) of Foreign Relations Law* § 421(2)(j) (1987); *see also Restatement (Second) of Conflict of Laws* § 50 (1971). Despite Labatt's assertions to the contrary, *see* (Nov. 6 Tr. 9–10), the law in this circuit is clear that this doctrine applies equally in both civil and criminal actions. *See Securities and Exchange Comm'n v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir.1990) (invoking effects doctrine in SEC enforcement action); *In re Marc Rich & Co., A.G.*, 707 F.2d 663, 667–68 (2d Cir.1983) (finding that effects doctrine empowered district court to exercise personal jurisdiction to enforce a grand jury subpoena *duces tecum* against foreign corporation); *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir.1972) (finding personal jurisdiction over defendants in civil securities fraud action, pursuant to effects doctrine); *Eskofot*, 872 F.Supp. at 87 (applying the effects doctrine in a civil antitrust suit); *Herbstein v. Bruetman*, 768 F.Supp. 79, 81–82 (S.D.N.Y.1991) (holding that effects doctrine is applicable to defendant in civil RICO suit). Although the time-sensitive nature of the instant matter prevented this Court from conducting extensive research regarding the

positions of other jurisdictions on this issue, this Court did ascertain that at least several other federal jurisdictions recognize and apply the effects doctrine in a variety of contexts. *See e.g., MCG, Inc. v. Great Western Energy Corp.,* 896 F.2d 170, 173–74 (5th Cir. 1990) (holding that federal court may sustain jurisdiction over foreign defendant in securities actions under effects test); *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986) (applying effects doctrine to obtain jurisdiction over foreign insurance company in action to collect medical malpractice judgment); *Butte Mining PLC v. Smith,* 876 F.Supp. 1153, 1162–64 (D.Mont.1995) (analyzing jurisdiction under effects test in civil securities fraud and RICO suit), *aff'd,* 76 F.3d 287 (9th Cir.1996).

In the instant case, this Court finds that Labatt's actions in Canada have caused an effect in the United States because they: (1) hinder the Election Officer's ability to supervise the 1996 IBT Election process; (2) compromise the fair, free, and democratic character of the 1996 IBT Election; and (3) endanger the Consent Decree's goal of eradicating the hideous influence of organized crime from the IBT.

To reiterate, Labatt refuses to provide Hoffa and all other non-employee IBT members access for campaign purposes to the parking lot used by IBT members, in contravention of Article VIII, Section 11(e) of the 1996 Election Rules. (Govt.'s Memo at 2); (Rules for the 1995–1996 IBT International Union Delegate and Officer Election, Art. VIII, § 11(e).) The 1996 Election Rules, approved by this Court as well as by the Second Circuit, *United States v. International Bhd. of Teamsters [1996 Election Rules Opinion],* 896 F.Supp. 1349 (S.D.N.Y.1995), *aff'd as modified,* 86 F.3d 271 (2d Cir.1996), are the "linchpin" in the ongoing effort to cleanse the IBT of the "hideous influence of organized crime." 896 F.Supp. at 1354; *United States v. International Bhd. of Teamsters [1991 Election Rules Opinion],* 742 F.Supp. 94, 97 (S.D.N.Y.1990), *aff'd as modified,* 931 F.2d 177 (2d Cir.1991). They set forth comprehensive and uniform rights, duties, and procedures that apply throughout the United States and Canada to ensure that the 1996 IBT Election is free, fair, and informed. *1996 Election Rules Opinion,* 896 F.Supp. at 1354, 1367; *1991 Election Rules Opinion,* 742 F.Supp. at 187. As set forth in the 1996 Election Rules, and recognized by both this Court and the Second Circuit, limited access by IBT members to employer premises for campaign purposes "is both warranted and necessary to ensure that the IBT membership is well informed regarding its choice of candidates," as well as "crucial to the achievement of a free, fair, and democratic election process...." *1996 Election Rules Opinion,* 896 F.Supp. at 1367; *see Yellow Freight,* 948 F.2d at 103.

The Election Rules have the force of a court order and are "enforceable upon pain of contempt." 896 F.Supp. at 1373. Moreover, as the rules themselves, make clear, the 1996 Election Rules are applicable in Canada:

> The [Election] Rules apply to all delegate, alternate delegate and International Officer nominations and elections, including those conducted outside the territorial jurisdiction of the United States. No distinction shall be made between nominations conducted within the United States and those conducted outside the United States.

(Rules for the 1995–1996 IBT International Union Delegate and Officer Election, Art. XVI.)

Labatt's refusal to comply with the limited-access provisions of the 1996 Election Rules causes an effect in the United States because it hinders the Election Officer's ability to supervise the 1996 IBT Election. Under the Consent Decree, the Election Officer is responsible for supervising the rank-and-file elections of delegates to the 1996 IBT Convention as well as the subsequent rank-and-file election of IBT officers from among the candidates nominated at the 1996 IBT Convention. *See* Stipulation & Order Implementing Paragraph 12(D)(ix) of the March 19 [sic], 1989 Consent Decree (S.D.N.Y. Feb. 7, 1995) (conferring upon Election Officer "all rights and duties conferred upon the 1991 Election Officer by paragraph 12 of the Consent Decree"); *1996 Election Rules Opinion,* 896 F.Supp. 1349 at 1353; Consent Decree, ¶ 12(D)(ix). The Election Officer is thus

vested with the authority not only to promulgate the 1996 Election Rules, *1996 Election Rules Opinion*, 896 F.Supp. 1349 at 1353; *1991 Election Rules Opinion*, 931 F.2d at 181; Consent Decree, ¶ 12(D)(ix), but also "to interpret, to enforce and, when necessary, to amend the Rules." (Rules for the 1995–1996 IBT International Union Delegate and Officer Election, Art. I.) The Election Officer further "reserves the authority to take all necessary actions in supervising the election process to insure fair, honest, open and informed elections." *Id.* Labatt's refusal to permit limited campaign access to its premises thus not only violates the 1996 Election Rules, but also interferes with the Election Officer's duty to enforce them. Labatt therefore causes an effect in the United States sufficient to confer personal jurisdiction over it in this Court.

Labatt's refusal to comply with the limited-access provisions of the Election Rules also causes an effect in the United States because it compromises the free, fair, and democratic character of the 1996 IBT Election. The Consent Decree guarantees rank-and-file IBT members the right to participate democratically in the 1996 IBT Election. *See* Consent Decree ¶ 12(D)(vii), (viii). Moreover, the 1996 Election Rules expressly incorporate several provisions of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 United States Code, Sections 401–531, that guarantee union members various election-related rights. (Rules for the 1995–1996 IBT International Union Delegate and Officer Election, Art. XIII.) Among these specifically incorporated rights is the right of union members "to meet and freely assemble with other members," *id.* (incorporating 29 U.S.C. § 411(a)(2)), the right to receive campaign literature, *id.* (incorporating 29 U.S.C. § 481(c)), and "the right to vote for or otherwise support the candidate or candidates of his choice." *Id.* (incorporating 29 U.S.C. § 481(e)). By prohibiting Hoffa and other IBT candidates from accessing the IBT employee parking lot, Labatt prevents the rank-and-file IBT members whom it employs from assembling, from obtaining campaign literature from candidates, and from supporting the candidates of their choice.

By preventing rank-and-file IBT members from exercising the political rights guaranteed them by the Consent Decree and the 1996 Election Rules, Labatt frustrates the purpose of the 1996 Election Rules—"ensur[ing] that the IBT membership is well informed regarding its choice of candidates," and that the 1996 Election is "free, fair, and democratic." *1996 Election Rules Opinion*, 896 F.Supp. at 1367. This Court recognizes that the IBT members directly affected by Labatt's actions likely are in Canada, not the United States. This Court also recognizes, however, that the strength of an electorate is only as great as that of its weakest members. Consequently, restricting the ability of any IBT members to participate fully in the union election process necessarily dilutes the quality of the election as a whole. This Court therefore finds that Labatt's actions cause an effect in the United States.

Finally, Labatt's refusal to comply with the limited-access provisions of the Election Rules endangers the goals of the Consent Decree. It is well-documented that the goal of the Consent Decree is to rid the IBT of the "hideous influence of organized crime." *E.g., 1996 Election Rules Opinion*, 896 F.Supp. at 1349; *see* Consent Decree, at 2 ("it is imperative that the IBT ... be maintained democratically, with integrity and for the sole benefit of its members without unlawful outside influence"). It is similarly clear that "no question is more central to the ultimate success of the Consent Decree than ... democratic, secret ballot elections...." *1991 Election Rules Opinion*, 742 F.Supp. at 97; *see 1996 Election Rules Opinion*, 896 F.Supp. at 1353. As this Court stated prior to the 1991 IBT Election, the concept of free, fair, and democratic elections "means more than just an honest ballot." *1991 Election Rules Opinion*, 742 F.Supp. at 97. It also means that "[c]andidates must be fearlessly free to communicate th[eir] views to the membership." *Id.*

The importance of communication among IBT members and candidates is no less crucial today, on the eve of the 1996 IBT Election, than it was five years ago. The applications that continue to flood this Court from

the IRB and the Election Officer provide ample evidence that "the minions of organized crime continue to haunt the IBT," and that "[i]t is of paramount importance that the same spirit of vigilance that vitalized the 1991 IBT election energize the 1995–1996 IBT election process if the arduous and painstaking work of implementing the Consent Decree is to be preserved and built upon." *1996 Election Rules Opinion,* 896 F.Supp. at 1353. As this Court has noted, it is not just IBT members—in the United States as well as Canada—who have an interest in a free and democratic union:

> [t]he American public as a whole will benefit when the union of more than 1.4 million members is freed from the clutches of organized gangsterism. Union corruption takes an enormous toll on its members and the public. The sociological and economic cost it levies on society and on commerce is incalculable.

*Id.* at 1353–54.

Accordingly, this Court finds that any action taken by any entity that endangers the free flow of information between candidates for IBT office and the rank-and-file IBT electorate threatens the very purposes that the Government and the IBT intended the Consent Decree to serve. Labatt's refusal to permit campaign-related parking lot access to any IBT candidate who is not employed by Labatt unquestionably achieves this result. This Court thus finds that Labatt actions endanger the Consent Decree, and thus, cause an effect in the United States.

In sum, Rule 4(k)(2) provides this Court with personal jurisdiction over foreign corporation Labatt. Rule 4(k)(2) is clearly applicable to the present matter because this matter arises under federal law, and because Labatt is not subject to personal jurisdiction in any court of general jurisdiction. Moreover, Labatt has sufficient aggregate minimum contacts with the United States to satisfy constitutional notions of due process because Labatt's refusal to permit limited, campaign access to its premises in Canada causes effects in the United States. Accordingly, this Court finds that it has personal jurisdiction over Labatt, and that Labatt's objections to this Court's exercise of personal jurisdiction over it should be dismissed.

## II. Applicability of the Consent Decree Abroad

 The only question remaining before this Court is whether it is proper for this Court to grant the relief the Government requests—an order directing Labatt to comply with the October 17, 1996, decision of the Election Officer. (Govt.'s Memo at 1.) This question raises yet another novel issue of Consent Decree law, specifically, the applicability of the Consent Decree in a foreign jurisdiction.

According to the Government, the law underlying the instant inquiry is clear. The 1996 Election Rules which Labatt has violated have the force of a court order, are "enforceable upon pain of contempt," and are, by their plain terms, applicable in Canada. (Govt.'s Memo at 4–5.) Moreover, "this Court and the Second Circuit, have already conclusively determined that under the All Writs Act, 28 U.S.C. § 1651, the Election Rules are applicable to any employer who is in a position to frustrate the implementation of the Consent Decree. *Id.* at 4. In addition, the Government states that "this Court has already held that the limited access rules set forth in the 1996 Election Rules is applicable to employers." *Id.* at 4–5. In light of these precedents, the Government asserts not only that "Labatts has violated the clear and unambiguous order of the Election Officer," *id.* at 5, but also that it has failed to demonstrate that its refusal was justified. *Id.* at 2. Accordingly, the Government seeks an order from this Court directing Labatt to comply with the October 17, 1996, decision of the Election Officer. *Id.* at 1.

As for questions of international comity, the Government asserts that they do not require a different result. Although the Government concedes the existence of a provision of Quebec law that provides an employer the right to prohibit union meetings on its property, it asserts that Labatt "does not argue that anything in Quebec law prohibits Labatt from permitting access to its parking lots." *Id.* at 6. The Government explains that "the Supreme Court has explicitly held

that where, as here, 'a person subject to regulation by two states can comply with the laws of both,' there is no true conflict requiring the Court to restrain the exercise of its jurisdiction on the grounds of international comity." *Id.* Moreover, in the absence of a conflict between the domestic law and foreign law, the Government states that "comity considerations are not compelling." *Id.* Thus, the Government concludes that Labatt "may comply with both Canadian and United States law by allowing access onto its property." *Id.*

In response to the Government's arguments, Labatt makes only one, brief claim. Labatt asserts that this Court "should decline to grant the order the Government seeks on the grounds of comity." (Labatt's Memo at 7.) Labatt cites just one case, from the Fourth Circuit, in support of the proposition that "conflict of rights under relevant foreign law makes the issuance of injunction inappropriate in light of international comity concerns." (Labatt's Memo at 7 (citing *Nintendo of America, Inc., v. Aeropower Co., Ltd.*, 34 F.3d 246 (4th Cir.1994).)

In addition, Labatt submits an affidavit from Guy Lemay ("Lemay"), a Canadian lawyer employed by the firm in Quebec which represents Labatt in Quebec. (Affidavit of Guy Lemay, *United States v. International Bhd. of Teamsters*, 88 Civ. 4486 ("Lemay Aff.") ¶ 1 (Nov. 5, 1996).) According to Lemay, "[u]nder the law of Quebec, an employer has the right to prohibit any union meeting on its property." *Id.* ¶ 2. Lemay further states that it is his "professional opinion [that] this provision gives Labatt a clear right under Quebec law to deny Mr. Hoffa the access sought in the Government's application." *Id.* ¶ 3.

■ This Court's research regarding the issue of international comity reveals that the state of the law on this topic is much closer to that described by the Government than that sketched in Labatt's memorandum. According to the Supreme Court, "the threshold question in a comity analysis is whether there is in fact a true conflict between the domestic and foreign law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798, 113 S.Ct. 2891, 2910, 125 L.Ed.2d 612 (1993);

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct. for the Southern Dist. of Iowa*, 482 U.S. 522, 555, 107 S.Ct. 2542, 2562, 96 L.Ed.2d 461 (1987) (Blackmun, J., concurring in part and dissenting in part). In fact, " 'the fact that the conduct is lawful in the state in which it took place will not, of itself, bar application of the United States [ ] laws,' even where the foreign state has a strong policy to permit or encourage such conduct." *Hartford Fire Ins. Co.*, 509 U.S. at 799, 113 S.Ct. at 2910 (citing *Restatement (Third) Foreign Relations Law* § 415, Comment j). Moreover, "[n]o conflict exists, for these purposes, 'where a person subject to the regulation by two states can comply with the laws of both.' " *Id.* (citing *Restatement (Third) Foreign Relations Law* § 415, Comment e). In the absence of a claim that compliance with the laws of both countries is impossible, no conflict of laws exists. *Id.;* see *Restatement (Third) Foreign Relations Law* § 403, Comment e, § 415, Comment j.

■ Having studied this case law as well the Quebec law cited by Labatt, this Court finds that ordering Labatt to comply with the October 17, 1996, decision of the Election Officer does not offend any notions of international comity because there is no conflict between the laws at issue. As for the Consent Decree law and the Quebec law in question, both the Government and Labatt agree on the substance of each. *Compare* (Labatt's Memo at 3) *and* (Govt.'s Memo at 4) (regarding Consent Decree law); *compare* (Lemay Aff. ¶ 2) *and* (Govt.'s Supp. Memo at 6) (regarding Quebec Labor Code). Under the All Writs Act, this Court has the power to enforce the Consent Decree, and Election Rules promulgated pursuant to the Consent Decree, against a non-party, such as an employer, so long as this Court has jurisdiction over the non-party. *Star Market*, 954 F.2d at 808–810; *Yellow Freight*, 948 F.2d at 102–04. Under the Quebec Labor Code, "[n]o association of employees shall hold any meeting of its members at the place of employment unless it is certified and has obtained the consent of the employer." (Lemay Aff. ¶ 2 (quoting Quebec Labor Code, R.S.Q., c.C–27, Chap. II, Div. I, Section 6).)

This Court agrees with Labatt's Canadian counsel that the Quebec Labor Code provides Labatt the *"right"* to deny campaign access to union members. This Court, however, also finds nothing in this law that *requires* Labatts to deny campaign access to union members. On the contrary, by the law's own terms, an association of employees that is "certified" and that has "obtained the consent of the employer" *may* have access to its place of employment for meetings of its members. It is not surprising then, that neither Labatt's local nor its Quebec counsel claim that the cited provision of the Quebec Labor Code conflicts with either the 1996 Election Rules or any relevant Consent Decree case law, or that compliance with both Canadian and American law is impossible. Absent such a claim of impossibility, no conflict of laws exists. *Hartford Fire Ins. Co.,* 509 U.S. at 799, 113 S.Ct. at 2910–11.

The lone case cited by Labatt in an attempt to defend its position does not require a different result. In *Nintendo of America, Inc., v. Aeropower Co., Ltd.,* 34 F.3d 246 (4th Cir.1994), the Fourth Circuit faced the question whether extraterritorial infringement of a trademark holders' video games in the United States and Canada could be enjoined under the Lanham Act, 15 U.S.C. §§ 116, 1121. *Id.* at 247–48. Although the court stated that extraterritorial infringement of the Lanham Act could be enjoined in certain case, the court declined plaintiff's request for an injunction in the case before it. *Id.* at 250–51. According to the Fourth Circuit, the Supreme Court has held that a federal court has power to enjoin extraterritorial conduct that violates the Lanham Act only if three specific factors are present. *Id.* at 250. Because all three factors were not present in the case before it, the Fourth Circuit found that an injunction should not issue against defendants. *Id.* at 250–51.

The *Nintendo* case has no precedential value to the instant analysis. The Fourth Circuit's ruling is based clearly and exclusively on law specific to causes of action arising under the Lanham Act. The Supreme Court case cited by the Fourth Circuit speaks solely to the issue of extraterritorial application of American law in trademark disputes, as do the various circuit court cases that follow the Supreme Court. The dispute at bar, however, concerns only labor law, not trademark law. Despite Labatt's counsel's confusion regarding other matters in this case, this Court imagines that even he would concede this fact. This Court thus finds that the *Nintendo* case cited by Labatt is irrelevant and inapplicable to the present case.

Accordingly, this Court finds that Labatt's arguments regarding international comity are meritless, and that they provide no bar to Labatt's compliance with the decision of the Election Officer, the 1996 Election Rules, and the Consent Decree. This Court further finds that the Government's request for an order directing such compliance should be granted.

## CONCLUSION

IT IS HEREBY ORDERED THAT Labatt Brewing Company comply fully, within twenty-four hours of receipt of this Opinion and Order, with the October 17, 1996, decision of the Election Officer in Election Case No. P–942–LAB–CAN, by allowing Mr. James P. Hoffa, and/or any other nonemployee members of the International Brotherhood of Teamsters to have access for campaign purposes to the parking lot where IBT members park their personal vehicles at the Labatt's facility in LaSalle, Quebec, Canada.

SO ORDERED.