DAVENTREE LIMITED and Audia Investments Ltd., Plaintiffs,

and

Oily Rock Group, Ltd., Nominal Plaintiff

v.

REPUBLIC OF AZERBAIJAN, State Property Committee of Azerbaijan, Nadir Nasibov, Barat Nuriyev, von Meiss Blum, Claude Blum, Hans Bodmer, Rolf Schmid, Andre Wahrenberger, Hyposwiss Schweizerische Hypotheken—und Handelsbank, Theodore Horath and Kurt Buchmann, Defendants.

No. 02 Civ. 6356(SHS).

United States District Court, S.D. New York.

Dec. 28, 2004.

740

Joseph D. Pizzurro Curtis, Samuel Rosenthal, T. Barry Kingham, Curtis, Mallet-Prevost, Colt & Mosle, L.L.P., New York, NY, for plaintiffs.

*OPINION & ORDER*

STEIN, District Judge.

### *TABLE OF CONTENTS*

I. BACKGROUND ........................................................743
 A. *The Parties* ........................................................743
 B. *Outline of the Alleged Fraudulent Scheme* ............................744
 C. *The SOCAR Privatization Program* ...................................744
 D. *Extortion of Plaintiffs' Investments* ..................................745
 E. *The Failure to Privatize SOCAR* .....................................747

II. THE SOVEREIGN DEFENDANTS' MOTION TO DISMISS ...................747
 A. *Subject Matter Jurisdiction Exists Under the FSIA as to the Extortion*
 *Claims but not as to the Failure to Privatize Claims* ....................747
 1. Legal Standards: ...............................................748
 a. Dismissal for Lack of Subject Matter Jurisdiction ...................748
 b. The Commercial Activity Exception ..............................748
 c. The Expropriation Exception.....................................749
 2. The Commercial Activity Exception Applies to the Extortion Claims:.....750
 3. The Expropriation Exception Does Not Apply to the Failure to
 Privatize Claims ..............................................751
 B. *Heydar Aliyev Is Not a Necessary Party* ..............................751
 C. *Daventree Is an Adequate Representative to Bring this Suit*................752

D. The Equitable Defense of Unclean Hands Does Not Require Dismissal of
 Plaintiffs' Claims .................................................... 753
E. The Act of State Doctrine Does Not Apply ............................... 754
F. Dismissal for Forum Non Conveniens Is Not Warranted .................. 755

III. HYPOSWISS DEFENDANTS' MOTION TO DISMISS ....................... 757
 A. Legal Standards ...................................................... 757
 1. Dismissal for Lack of Personal Jurisdiction ..................... 757
 2. Personal Jurisdiction pursuant to the New York Long–Arm Statute ..... 758
 a. CPLR § 302(a)(1)—Transacting Business within New York ......... 758
 b. CPLR § 302(a)(2)—Commission of a Tortious Act within New
 York ....................................................... 758
 c. Imputation of a Co-conspirator's Contacts with New York ......... 759
 3. Personal Jurisdiction pursuant to Rule 4(k)(2) .................... 760
 a. Minimum Contacts ......................................... 760
 b. Reasonableness .......................................... 761
 4. Entitlement to Jurisdictional Discovery ........................... 761
 B. Analysis .......................................................... 761
 1. The Hyposwiss Defendants Are Not Subject to Long–Arm
 Jurisdiction in New York ......................................... 761
 a. CPLR §§ 302(a)(1) and 302(a)(2) Do Not Apply to the Hyposwiss
 Defendants Directly ......................................... 762
 b. Acts of Putative Co-conspirators Cannot Be Imputed to
 Hyposwiss Defendants ...................................... 762
 2. Hyposwiss Defendants Are Not Subject to Specific Jurisdiction
 Pursuant to Rule 4(k)(2) ........................................ 763
 3. Plaintiffs Are Entitled to Jurisdictional Discovery as to Privatbank's
 Investing Activities in the United States .......................... 765

IV. CONCLUSION .................................................... 765

This action arises out of the government of Azerbaijan's program to privatize Azerbaijan's government-owned oil company, the State Oil Company of the Azerbaijan Republic ("SOCAR"). Plaintiffs Daventree Limited ("Daventree") and Audia Investments Ltd. ("Audia") sue on their own behalves, and Daventree also brings this action as a shareholder of and on behalf of nominal plaintiff Oily Rock Group pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. Plaintiffs seek more than $100 million in damages arising out of the allegedly fraudulent and corrupt privatization program.

Plaintiffs assert federal claims based on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and on the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350, as well as various New York state law claims. For simplicity's sake, the defendants will be classed into four groups: first, "the Sovereign defendants," consisting of the Republic of Azerbaijan and the State Property Committee of Azerbaijan ("SPC");[1] second, "the Azeri individual defendants," consisting of Nadir Nasibov and Barat Nuriyev; third, "the vMB Defendants," consisting of the law firm of von Meiss Blum ("vMB") and its partners Claude Blum, Hans Bodmer, Rolf Schmid and Andre Wahrenberger; and finally, "the Hyposwiss defendants," consisting of Hyposwiss Privatbank, Ltd., formerly Hyposwiss Schweizerische Hypotheken—und Han-

1. Pursuant to this Court's Orders dated March 10, 2003 and October 15, 2003, all claims asserted against defendants Heydar Aliyev and Ilham Aliyev, formerly members of the Azeri Sovereign defendants, have been dismissed without prejudice.

delsbank, ("Privatbank"), and two officers of that bank—Theodore Horath and Kurt Buchmann. Currently pending are separate motions of the Sovereign defendants and the Hyposwiss defendants to dismiss all claims asserted against them.

The Sovereign defendants contend that plaintiffs' ATCA and pendent New York state law estoppel and unjust enrichment claims [2] must be dismissed pursuant to Rules 12(b)(1), 12(b)(3), and 12(b)(7) of the Federal Rules of Civil Procedure—for lack of subject matter jurisdiction, for improper venue and for failure to join a necessary party, respectively. The Hyposwiss defendants seek dismissal of plaintiffs' civil RICO claims and the ATCA claim pursuant to Rules 12(b)(2) and 12(b)(6)—for lack of personal jurisdiction and for failure to state a claim upon which relief may be granted.

For the reasons set forth below, the Sovereign defendants' motion to dismiss is granted in part and denied in part. Specifically, plaintiffs' claims alleging takings in violation of international law, promissory estoppel, equitable estoppel, and unjust enrichment (counts six, nine, ten and eleven in the Complaint) are dismissed.

The Hyposwiss defendants' motion to dismiss for lack of personal jurisdiction is also granted in part and denied in part. Specifically, because this Court finds that it cannot exercise personal jurisdiction over individual defendants Horath and Buchmann under either the relevant New York long-arm statute or Rule 4(k)(2) of the Federal Rules of Civil Procedure, all claims against those defendants are dismissed pursuant to Rule 12(b)(2). Moreover, because an issue of jurisdictional fact

exists as to whether general jurisdiction exists over defendant Privatbank pursuant to Rule 4(k)(2), that defendant's motion to dismiss is denied without prejudice to its renewal pending conclusion of jurisdictional discovery.

## I. BACKGROUND

The following facts are as alleged in the Complaint:

### A. The Parties

Plaintiffs Daventree, Audia, and Oily Rock are three foreign corporations. Daventree is organized under the laws of Cyprus, which is also its principal place of business. (Compl. at ¶¶ 20–22). Audia and Oily Rock are organized under the laws of British Virgin Islands, where they have their respective principal places of business. (Id.) Both Daventree and Audia were shareholders of Oily Rock at the times relevant to this action. (Id. at ¶ 24). Currently, only Daventree remains an Oily Rock shareholder. (Id.)

Defendant Azerbaijan, a sovereign state and former member state of the Soviet Union, is located on the Caspian Sea and has extensive oil and gas reserves. (Compl. at ¶ 4). Heydar Aliyev was, at all times relevant to this action, the President of Azerbaijan and his son, Ilham Aliyev, was the First Vice President of SOCAR. (Id. at ¶¶ 28–29). The Azeri individual defendants, Nadir Nasibov and Barat Nuriyev, were the Chairman and the Deputy Chairman of the SPC. (Id. at ¶¶ 30–31).

Providing legal representation at various times and for several parties, vMB is a Swiss law firm that allegedly "controlled and operated numerous secret Swiss ac-

**2.** Because the civil RICO claims were maintained, as among the Sovereign defendants, only against defendants Heydar and Ilham Aliyev, those claims have been dismissed. Therefore, this Court need not address Sovereign defendants' arguments as to the legal insufficiency of the civil RICO claims as asserted against them or whether the allegations of fraud relating to the RICO claims were made with sufficient particularity.

counts" for laundering the proceeds of the racketeering activities. (Compl. at ¶ 32). The partners of vMB—Messrs. Bodmer, Blum, Schmid, and Wahrenberger—all citizens of Switzerland, have been named as defendants as well. (*Id.* at ¶ 33). As the business agent and corporate secretary of Oily Rock, Bodmer allegedly played a central role in the racketeering scheme, acting as a "hub" for all the other defendants by arranging complex financial transactions and leading global expeditions in pursuit of foreign investors for the Azeri privatization program. (*Id.* at ¶ 34). In addition, Bodmer is alleged to have been a member of the board of directors of Privatbank—a Swiss bank—exercising control over that bank's illegal activities. (*Id.*) The remaining vMB defendants similarly assisted the racketeering enterprise by participating in communications with investors and transfers of cash. (*Id.* at ¶¶ 35–38). Finally, defendant Privatbank, together with its President—Horath—and its Vice President—Buchmann—assisted the alleged racketeering scheme by effecting numerous transfers of funds. (*Id.* at ¶¶ 39–41).

## B. Outline of the Alleged Fraudulent Scheme

As background for the Azeri privatization at issue here, the complaint broadly describes an Azeri government engaged in a recurring pattern of fraud. The typical format of that fraud, the complaint alleges, is as follows (Compl. at ¶¶ 42–44):

Initially, the Azeri defendants induce investment in their government programs by making statements to potential investors that lead them to believe that they can obtain the "goodwill" of then Azeri President Heydar Aliyev, thereby obtaining a competitive advantage over other investors. Once investors have committed themselves financially, the Azeri defendants then engage in a gradually intensifying campaign of extortion against the investors. The scheme begins with demands to provide substantial kickbacks to the Azeri defendants, which are backed by threats to remove Heydar Aliyev's goodwill. The economic threats can escalate to harsher sanctions, such as the kidnapping of investors or their agents.

## C. The SOCAR Privatization Program

In 1995, Azerbaijan announced that it would privatize substantially all of its state-owned assets, including SOCAR, with Heydar Aliyev retaining the sole discretion to decide whether and when to privatize these Azeri industries. (Compl. at ¶¶ 45–46). The privatization of SOCAR was to take place in three stages: the first stage of which would involve the distribution of shares to Azerbaijan's citizens, the second stage involved a voucher auction of over half of the available shares, and the third stage would allow for the cash auction of the remaining shares. (*Id.* at ¶ 47). In this scheme, a "share" is in fact a booklet with four vouchers which could be used to bid on the state-owned assets during stage two. (*Id.* at ¶ 48).

While Azeri citizens were allowed to buy and transfer vouchers freely, the Azerbaijan government required foreign investors to purchase an "option" for every voucher they purchased; further, each option was to have a three year "circulation" or expiration date. (Compl. at ¶¶ 50–51). When first sold, the options cost approximately $0.50 each, and remained so until October 1997. (*Id.* at ¶ 52).

In July 1997 on behalf of plaintiffs, Oily Rock—which had been established as an investment vehicle to acquire vouchers for the privatization auctions—began purchasing about $1.9 million worth of these vouchers on the open market from various sources. (Compl. at ¶¶ 53, 56–7). Plain-

tiffs made these purchases by wiring millions of dollars into Azerbaijan. (*Id.* at ¶ 59).

#### D. Extortion of Plaintiffs' Investments

At some point during the summer of 1997, the extortionate scheme began when two of Oily Rock's agents were allegedly "kidnapped" by the police in Azerbaijan, resulting in the seizure of approximately $2 million in cash and thousands of vouchers that the agents were transporting. (Compl. at ¶ 60). Subsequent to this incident, an Oily Rock representative was instructed to see President Aliyev. (*Id.* at ¶ 61). At the arranged meeting, the President "made clear to Oily Rock" that the privatization of SOCAR would occur in the "near future." (*Id.* at ¶ 62).

At a subsequent meeting with Ilham Aliyev, Nasibov, and Nuriyev, the plaintiffs were informed that they could no longer purchase vouchers in the marketplace at the prevailing rates. Instead, they had to purchase vouchers exclusively through sources that the Azeri defendants identified and at inflated prices. (Compl. at ¶¶ 62–63). In addition, Ilham Aliyev, Nasibov, and Nuriyev instructed Oily Rock agents that they were no longer permitted to wire money into Azerbaijan, but had to use couriers to transfer what ultimately amounted to millions of dollars of United States currency across the Azeri borders in order to avoid documentation. (*Id.* at ¶ 64). Failure to comply with these new terms, the Azeris threatened, would result in the confiscation of those vouchers already purchased. Having invested substantial sums already, Oily Rock acquiesced and made continuing investments through 1998, paying up to three times the 1997 price of vouchers. (*Id.* at ¶¶ 65–67).

The other two groups of defendants— the vMB and Hyposwiss defendants—are alleged to have provided active assistance to the Azeri defendants throughout this scheme. In particular, both groups of defendants aided in the concealment of these transactions by employing various covert measures including the use of "code names" and insisting on payment in cash. (Compl. at ¶¶ 68–72). The vMB and Hyposwiss defendants allegedly played significant roles in the Azeri defendants' fraud, all the while "knowing that the money they were transferring had been stolen from Oily Rock." (*Id.* at ¶ 68). As a result of the defendants' actions, Oily Rock, and its wholly-owned subsidiary Minaret, invested in excess of $130 million in the Azeri vouchers and options (*Id.* at ¶¶ 54, 77–8).

In October 1997, Heydar Aliyev summoned the plaintiffs' representatives to a meeting where he explained that Oily Rock "needed his 'good will'," and that in order to obtain that "good will" Oily Rock would have to give him two-thirds of all vouchers and options it had acquired. (Compl. at ¶ 80). Heydar Aliyev bolstered the demand with further threats to confiscate property, kidnap Oily Rock employees, and cease his "personal protection" for plaintiffs' representatives. (*Id.*). Plaintiffs again acquiesced to these demands "[i]n order to avoid the confiscation and loss of tens of millions of dollars already invested in the Azeri Privatization Scheme." (*Id.* at ¶ 81).

Plaintiff Audia became involved in the privatization scheme as a result of having invested more than $50 million in Oily Rock. In particular, Audia asserts that the Azeri defendants induced Audia's investments through "false and misleading statements, and omissions of material facts, relating to whether a decision had been made to privatize SOCAR, and when such privatization would occur." (Compl. at ¶¶ 91–96). Relying on the same alleged misrepresentations, plaintiff Daventree

"invested $25 million into Oily Rock. . . ." (*Id.*) In addition, Daventree, one of the two largest shareholders of Oily Rock, loaned Oily Rock tens of millions of dollars "[i]n order to fund Oily Rock's continuing purchase of vouchers ..." and "based on statements and representations, inter alia, that defendant Heydar Aliyev had already made the decision to privatize SOCAR, that it would occur in the near future, and that Oily Rock would be allowed to participate in that privatization." (*Id.* at ¶¶ 96, 99–104).

The Azeri defendants are also alleged to have artificially increased the market rate for vouchers fifty-fold in order to maximize their profits upon resale of the vouchers. (Compl. at ¶¶ 84–87). As a result of the price manipulation, "the value of the options extorted by [the Azeri defendants] from Oily Rock, including plaintiffs and other investors, multiplied from approximately $10 million to over $260 million." (*Id.* at ¶ 88).

Throughout March 1998, in order to "obtain purchasers for the vouchers and options which they had extorted from Oily Rock, the defendants arranged to have Nasibov and Nuriyev travel to the United States to meet with potential investors." (Compl. at ¶ 108). During their trips to New York City, Florida, Colorado, and Washington, D.C., those two individual defendants "through knowingly false and fraudulent statements and omissions, attempted to induce investors to participate" in the privatization scheme. (*Id.* at ¶¶ 106, 109–12). Moreover, [a]s part of defendants' unlawful scheme to have U.S. investors purchase options stolen from Oily Rock and its shareholders," defendants caused U.S. investors to wire more than $167 million to vMB's account at Privatbank and other accounts "under the control of the vMB defendants." (*Id.* at ¶¶ 115–16). Similar transfers totaling $15 million to Privatbank occurred in June 1998. (*Id.* at ¶ 117).

In spring and summer of 1998, "defendants continued to solicit investment in the Azeri Privatization Scheme by representing that the decision had already been made to privatize SOCAR, which would occur in the near future." (Compl. at ¶ 114). U.S. investors allegedly relied upon those statement in purchasing vouchers and options when transferring funds from and through accounts in the United States to foreign intermediary accounts, "where the money was then transferred to Azerbaijan to consummate the purchases." (*Id.*) "As a direct and proximate result" of the defendants' schemes, U.S. investors allegedly spent tens of millions of dollars in purchasing the options and vouchers that had been extorted from Oily Rock and its shareholders. (*Id.* at ¶¶ 118–20). The scheme allegedly also involved the falsification of certificates to mask what was happening. (*Id.* at ¶ 122).

The Azeri defendants also allegedly "demanded a two-thirds interest in Oily Rock," a request to which Oily Rock acceded because "it had no choice other than to agree to the demands of the Azeri defendants." (Compl. at ¶ 124). This demand required an elaborate restructuring of Oily Rock, which was "controlled and orchestrated by the vMB defendants," including Schmid, along with direction from Bodmer. (*Id.* at ¶¶ 125–28). Throughout this process, the Azeri defendants misled plaintiffs and other U.S. investors that they had "Heydar Aliyev's 'good will' and protection by making false and misleading statements ... that SOCAR, inter alia, would be privatized in the near future and that these investors would be entitled to participate in the privatization of SOCAR." (*Id.* at ¶ 129).

Separate from the deleterious impact of the restructuring upon Oily Rock, both

Daventree and Audia allegedly were harmed by the substantial dilution of the value of their shares; moreover, when Oily Rock could not satisfy the Azeri's "extortionate demands," Daventree was "forced to advance money, or risk having its capital and other moneys invested in Oily Rock confiscated or otherwise diminished." (Compl. at ¶¶ 130–133). The Azeri defendants took further action in the United States to consummate their fraudulent plan by creating new entities, Oily Rock L.P. and Oily Rock U.S. Advisers, to conduct lobbying efforts in the United States on behalf of the Azeri defendants. (*Id.* at ¶¶ 135–38).

### E. The Failure to Privatize SOCAR

Despite his assurances regarding a process to privatize SOCAR, Heydar Aliyev "never fulfilled his promise to privatize SOCAR," which caused the value of the vouchers and options to decline dramatically. (Compl. at ¶¶ 139–41). The collapse in value of the SOCAR vouchers and options rendered Oily Rock "effectively bankrupt" and it was unable to repay its debt to Daventree. (Id. at ¶ 140). The defendants never refunded any of the plaintiffs' substantial investments in the privatization scheme. (Id. at ¶ 141).

## II. THE SOVEREIGN DEFENDANTS' MOTION TO DISMISS

The claims asserted against the Sovereign defendants fall into two groups based on the causes for plaintiffs' alleged losses: first, that the Sovereign defendants extorted SOCAR vouchers and options as well as Oily Rock shares from plaintiffs and resold those securities in the United States (the "extortion claims"); and second, that the Sovereign defendants failed to timely privatize SOCAR and caused plaintiffs' remaining vouchers and options to diminish in value (the "failure to privatize claims").

The first group consists of the sixth and twelfth claims, which allege that the Sovereign defendants violated the ATCA and were unjustly enriched by extorting money and property from plaintiffs. The second group of claims includes the seventh, ninth, and tenth claims asserted in the complaint.

### A. Subject Matter Jurisdiction Exists Under the FSIA as to the Extortion Claims but not as to the Failure to Privatize Claims

▋ The Sovereign defendants' motion to dismiss for lack of subject matter jurisdiction will be addressed at the outset because subject matter jurisdiction concerns the "very power of the court to hear case." *See W. 95 Housing Corp. v. N.Y. City Dep't of Housing Preservation and Development*, 01 Civ. 1345, 2001 WL 664628 at \*4 (S.D.N.Y. Jun.12, 2001) (internal citations omitted); *see also Ruhrgas AG, v. Marathon Oil Co.*, 526 U.S. 574, 584–585, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (holding that the doctrine of separation of powers typically requires resolution of jurisdictional issues before a court examines the merits of an action). The Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602–1611, "provides the sole basis for obtaining jurisdiction over a foreign state" in the courts of the United States. *See* 28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts" unless that immunity is specifically excepted elsewhere in the Act. *See id.*; 28 U.S.C. § 1605.

An independent basis for subject matter jurisdiction must exist for each of the two groups of claims asserted against the Sovereign defendants because the concept of supplemental jurisdiction has no applica-

tion to a foreign sovereign. *See Dar El–Bina Engineering & Contracting Co., Ltd. v. Republic of Iraq,* 79 F.Supp.2d. 374, 385–88 (S.D.N.Y.2000). Plaintiffs assert that, with respect to the extortion claims, the Sovereign defendants are stripped of their immunity pursuant to two separate provisions of the FSIA—the commercial activity exception in 28 U.S.C. Section 1605(a)(2) and the expropriation exception in 28 U.S.C. Section 1605(a)(3). With respect to their failure to privatize claims, plaintiffs assert that the expropriation exception applies. (Compl. at ¶ 208–214)

### 1. *Legal Standards:*

#### a. *Dismissal for Lack of Subject Matter Jurisdiction*

■ In making a determination as to the existence of subject matter jurisdiction, a court may consider evidence contained in affidavits or public documents as well as facts alleged in the pleadings. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986). The court construes all material factual inferences in the plaintiffs' favor, *see Hason v. Office of Professional Medical Conduct,* 314 F.Supp.2d 241, 246 (S.D.N.Y.2004); however, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atlantic Mutual Insurance Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992).

■ When a defendant moves to dismiss a complaint on the basis of foreign sovereign immunity, that defendant "must present a *prima facie* case that it is a foreign sovereign." *See Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 241 (2d Cir.2002) (internal quotations omitted). Once that initial burden it met, "the plaintiff has the burden of *going forward* with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Id.* (emphasis in original).

Only if the plaintiff discharges this burden of production does the "ultimate burden of persuasion" pass back to the "alleged foreign sovereign" defendant. *See id.*

#### b. *The Commercial Activity Exception*

■ The FSIA provides an exception to immunity if a foreign sovereign engages in "commercial activity." Specifically, 28 U.S.C. § 1605(a)(2) describes three ways that commercial activity can fall under this exception: (1) if the activity is "carried on in the United States by the foreign state;" (2) if the action is based upon "an act performed in the United States in connection with [the activity taking place] elsewhere;" or (3) if an act related to the activity "causes a direct effect in the United States." *See id.* Plaintiffs allege that the Sovereign defendants are stripped of their immunity pursuant to the first and third prongs of Section 1605(a)(2).

Section 1603(d) defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act ... [whose commercial character] shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." While this definition leaves the term "largely undefined," *Nelson,* 507 U.S. at 359, 113 S.Ct. 1471, the U.S. Supreme Court has limned its contours, explaining that "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). On the other hand, "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*) ...." *See Nelson,* 507 U.S. at 359–60, 113 S.Ct. 1471.

The Supreme Court in *Weltover* provided a useful example:

> Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts to acquire goods. (citation omitted).

504 U.S. at 614–15, 112 S.Ct. 2160.

Thus, in *Weltover*, the Supreme Court held that Argentina's issuance of bonds was a commercial activity for purposes of the FSIA. Noting the similarity between the economic features of sovereign bonds to private debt instruments, the Supreme Court deemed the nature of a sovereign debt issuance to be commercial. *See id.* at 615, 112 S.Ct. 2160. Moreover, the Court stressed, Argentina's purpose in participating in the bond market is irrelevant; only the fact that it did so matters. *See id.* at 617, 112 S.Ct. 2160. The statute demands that the activity's purpose—"the *reason* why the foreign state engages in the activity"—be distinguished from the activity's nature—"the outward form of the conduct that the foreign state performs or agrees to perform." *See id.* at 617, 112 S.Ct. 2160. Again, only the latter is relevant.

Once it is established that the conduct at issue is a "commercial activity" under the FSIA, the first prong of the commercial activity exception strips a sovereign of its immunity if "the action is based upon commercial activity carried on in the United States by the foreign state." *See* 28 U.S.C. § 1605(a)(2). To sustain subject matter jurisdiction under this exception, there must be "a significant nexus ... between the commercial activity in this country upon which the exception is based

and a plaintiff's cause of action." *See Reiss v. Societe Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir.2000) (quoting *NYSA–ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 38 (2d Cir.1993)). The third prong of the commercial activity exception—the activity "causes a direct effect"—is satisfied if the Sovereign defendants' activity results in "immediate consequences" rather than "speculative, generalized, immeasurable, and ultimately unverifiable effects" in the United States. *See Virtual Countries,* 300 F.3d at 237 (internal quotations omitted).

### c. The Expropriation Exception

 The FSIA also sets forth an exception to foreign sovereign immunity for situations involving the taking of property in violation of international law. *See* 28 U.S.C. § 1605(a)(3). As noted above, plaintiffs claim that the Sovereign defendants are stripped of their immunity not only due to the commercial activity exception of the FSIA, but also by virtue of the expropriation exception. To establish jurisdiction pursuant to that exception, the parties agree that a plaintiff must demonstrate: (1) rights in the property at issue; (2) that the property was "taken"; (3) that the taking was in violation of international law; and (4) that one of the two nexus requirements set forth in Section 1605(a)(3) is satisfied. *See Zappia Middle East Constr. Co. Ltd. v. The Emirate of Abu Dhabi,* 215 F.3d 247, 251 (2d Cir. 2000). As numerous courts have held, for purpose of the expropriations exception to the FSIA, the "property taken ... means physical property and not the right to receive payment." *See Lord Day & Lord v. Socialist Republic of Vietnam,* 134 F.Supp.2d 549, 560 (S.D.N.Y.2001) (citing *Hirsh v. State of Israel,* 962 F.Supp. 377, 383 (S.D.N.Y.1997)); *see also, Canadian*

*Overseas Ores Ltd. v. Compania De Acero Del Pacifico, S.A.*, 528 F.Supp. 1337, 1346–47 (S.D.N.Y.1982) (finding that the legislative history of 28 U.S.C. § 1605(a)(3) supports a definition of property in issue as "tangible property" instead of "intangible interests"); *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F.Supp.2d 189, 197 (D.D.C. Aug.23, 2004); *cf., Zappia*, 215 F.3d at 251 (deferring on the question as to "whether intangible contract rights are property under the [FSIA]").

### 2. The Commercial Activity Exception Applies to the Extortion Claims:

■ As a preliminary matter, the Sovereign defendants have claimed the status of a foreign sovereign and of an "agency or instrumentality" of that foreign sovereign. *See* 28 U.S.C. § 1603(a), (b). Plaintiffs do not contest those claims. Thus, the burden of production shifts to plaintiffs to establish the applicability of the commercial activity exception to their extortion claims. *See Virtual Countries*, 300 F.3d at 230.

The distinction between private commercial actions and those acts unique and peculiar to a sovereign is a focal issue in this action. The Sovereign defendants assert that the SOCAR privatization program is a uniquely governmental function because only a sovereign can privatize that which has been public. Plaintiffs, however, assert that the Azeri government was acting as a private economic actor, despite any official veneer cloaking its activities, when it sold and then resold vouchers and options for SOCAR.

Applying the principles the Supreme Court delineated in *Weltover*, a court in this district has deemed the conversion of state-owned entities into free-market enterprises, overseen by a government agency, a commercial activity for the purpose of the FSIA. *See WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F.Supp. 734, 740 (S.D.N.Y. 1997) (holding that such actions "reflect an exercise of 'powers that can also be exercised by private citizens,' and are akin to those that a controlling stockholder of a corporation might take as a 'player in the private market'") (quoting *Nelson*, 507 U.S. at 360, 113 S.Ct. 1471). Similarly, another district court held that the sale of a government company to a private corporation was a commercial activity by that government. *See Ampac Group, Inc. v. Republic of Honduras*, 797 F.Supp. 973, 977 (S.D.Fla.1992) (observing that under "commercial standards, such an agreement between corporations is routine and simple. It is the type of contract entered into by private parties that engage in commerce").

The Sovereign defendants contend that those cases did not address the very decision to privatize, which is, according to them, uniquely sovereign. While the Sovereign defendants may be correct that aspects of sovereignty inhere in the decision to privatize SOCAR, once that decision has been made, the offering of vouchers and options to plaintiffs and other purchasers was commercial. To raise capital, the Sovereign defendants allegedly solicited buyers in Azerbaijan and the United States and navigated the world of private commerce to achieve their financial goals. Thus, as in *Weltover*, although the purpose of offering privatization vouchers or issuing sovereign debts was public, the nature of that activity was private and commercial. *See WMW Machinery*, 960 F.Supp. at 740.

Having concluded that the course of conduct related to plaintiffs' extortion claims is a commercial activity, this Court also finds that a sufficient nexus has been alleged between the privatization of SOCAR and the United States for purpose of the FSIA. Construing all reasonable factual inferences in plaintiffs' favor, the Com-

plaint alleges that the Sovereign defendants extorted SOCAR vouchers and options as well as Oily Rock shares from plaintiffs and resold those securities to U.S. investors in 1998. (Compl. at ¶¶ 90–98, 105–123).

Because solicitation of prospective buyers took place in the United States in connection with the alleged resale of the SOCAR vouchers or options extorted from plaintiffs, (Compl. at 105–112) a "significant nexus" exists between events in this country and the course of conduct underlying plaintiffs' extortion claims. Accordingly, the first prong of the commercial activity exception is satisfied. *See Reiss*, 235 F.3d at 747. Similarly, the Complaint also alleges that U.S. investors sent more than $100 million to the Sovereign defendants to purchase SOCAR vouchers and Oily Rock shares allegedly extorted from plaintiffs. That allegation identifies an immediate and legally significant effect in the United States of the alleged extortion of securities from the plaintiffs. *See e.g., Parex Bank v. Russian Sav. Bank*, 116 F.Supp.2d 415, 421 (S.D.N.Y.2000). Therefore, the third, "direct effects" prong of the commercial activity exception also applies.

In sum, this Court finds that plaintiffs have discharged their burden of establishing the applicability of the commercial activity exception to their extortion claims and that subject matter jurisdiction exists over those claims pursuant to the FSIA.[3]

3. *The Expropriation Exception Does Not Apply to the Failure to Privatize Claims*

■ The gravamen of plaintiffs' failure to privatize claims is that, by allegedly reneging on their promise to privatize SOCAR in a timely fashion, the Sovereign

defendants effectively rendered worthless the vouchers and options plaintiffs had purchased. That, according to plaintiffs, was equivalent to a "confiscat[ion of] the property of the plaintiffs exchanged for those securities, i.e. dollars, without providing any value or compensation in exchange." (Compl. at ¶ 211) While a straightforward confiscation of cash may be "taking" of "rights in property" under the FSIA, that is clearly contrary to the allegations plaintiffs propound elsewhere in their Complaint—that they had purchased SOCAR vouchers and options for investment purposes.

By analogizing their purchase of SOCAR vouchers and options to a confiscation of cash, plaintiffs seek to transmute an assertion of their contractual rights to exercise options to purchase shares in SOCAR into a claim for expropriation. However, plaintiffs' failure to privatize claims do not arise from the taking of tangible property without compensation, but instead from the Sovereign defendants' failure to honor an alleged contractual obligation to carry out an orderly privatization program. Therefore, because those claims pertain to "contract rights or the right to receive payments," the expropriations exception does not apply and the Sovereign defendants are entitled to immunity as to those claims pursuant to the FSIA. *See Peterson*, 332 F.Supp.2d at 197 (citing *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 101 (8th Cir.1989)). Accordingly, this Court lacks jurisdiction to entertain the failure to privatize claims.

**B. Heydar Aliyev Is Not a Necessary Party.**

■ The Sovereign defendants also move to dismiss pursuant to Rule 12(b)(7)

---

**3.** Because plaintiffs have alleged facts sufficient to demonstrate the applicability of the commercial activity exception to their extortion claims, this Court needs not address

whether jurisdiction also exists over those claims pursuant to the expropriation exception.

of the Federal Rules of Civil Procedure for failure to join an indispensable party. They contend that to continue this action in Heydar Aliyev's absence would expose them to the risk of inconsistent obligations and the prejudice of lacking a witness essential to a just adjudication. The Sovereign defendants bear the burden to prove that Heydar Aliyev is an indispensable party, but they have failed to make such a showing. *See King v. Pine Plains Cent. School Dist.*, 918 F.Supp. 772, 783 (S.D.N.Y.1996)

■■■ Fed.R.Civ.P. 19 provides a two-step test for evaluating the effect of a party's absence from an action: first, the court determines whether that party is "necessary" to the action. *See Legal Aid Society v. City of New York*, 114 F.Supp.2d 204, 219 (S.D.N.Y.2000). A party is necessary if, *inter alia*, he or she "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... (ii) leave any of the persons already [involved in the action] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." *See Associated Dry Goods Corp. v. Towers Financial Corp.*, 920 F.2d 1121, 1123 (2d. Cir.1990) (quoting Fed.R.Civ.P. 19(a)). The second step is reached only if the court finds that the party is "necessary," but joinder is not feasible; then, the court considers whether the party is "indispensable" such that the action cannot proceed "in equity and good conscience" without that party's participation. *See Smith v. Kessner*, 183 F.R.D. 373, 375 (S.D.N.Y.1998) (quoting Fed.R.Civ.P. 19(b)).

The Sovereign defendants have failed to make even the preliminary showing—that Heydar Aliyev is a necessary party because his absence creates the risk of multi-ple or inconsistent obligations. Here, Heydar Aliyev does not have any claim against the Sovereign defendants arising from the course of conduct alleged. Cf. *Kessner*, 183 F.R.D. at 375 (holding that an absent party is necessary because it had the right to recover the same losses from a defendant). Moreover, because plaintiffs' failure to privatize claims are being dismissed on jurisdictional grounds, the continuation of this action will not interfere with SOCAR's prospects for privatization. Accordingly, the Sovereign defendants' motion to dismiss the action on the grounds that Heydar Alieyv is an indispensable party is denied because Heydar Aliyev is not a necessary party under Rule 19(a).

## C. Daventree Is an Adequate Representative to Bring this Suit.

■■■ The Sovereign defendants also move to dismiss this action on the grounds that Daventree is not "an adequate representative and is not qualified to act as a fiduciary of Oily Rock, its shareholders or creditors" and therefore "has no standing to pursue this action under Fed.R.Civ.P. 23.1." (Sovereign Defs. Mem. at 2). Specifically, they claim that Daventree, Audia, and Oily Rock were in fact controlled by a single individual, Victor Kozeny, who is presently a defendant in a pending civil suit that is related to this action and also faces related criminal charges. According to the Sovereign defendants, those circumstances give rise to inevitable conflicts of interest between Kozeny and other Oily Rock shareholders that render Daventree an inadequate representative. The Sovereign defendants further assert that because Kozeny allegedly defrauded other Oily Rock investors, Daventree, controlled by Kozeny, cannot serve as a fiduciary of Oily Rock and is thus an inadequate representative.

The burden of showing that plaintiffs would not be able to render "fair and adequate representation" rests with the Sovereign defendants. *See Johns v. Rozet,* 141 F.R.D. 211, 217 (D.D.C.1992) (citing *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982)). And the Sovereign defendants have not discharged that burden by demonstrating either that conflicts of interest exist between Daventree and other Oily Rock shareholders or that Daventree had been engaged in wrongdoing.

First, the Sovereign defendants' have not shown how the pending civil suits against Kozeny result in conflicts between Daventree's interests and that of other Oily Rock shareholders. Instead, they only adduce a conclusory assertion to that effect, which is insufficient. *See Sweet v. Bermingham,* 65 F.R.D. 551, 554 (S.D.N.Y.1975) (holding that, in a derivative suit, "a purely hypothetical dispute will not necessitate dismissal [because a] defendant must show that a serious conflict exists [because] ... [acting in the interests of the other shareholders] would harm [plaintiff's] other interests"). The general rule is that "when a derivative plaintiff demonstrates ... an intent and desire to vigorously prosecute the underlying corporate claim and ... has engaged competent counsel to assist in that endeavor then, absent either a conflict of interest which goes to the forcefulness of the prosecution or the existence of antagonism between the plaintiff and other shareholders arising from differences of opinion concerning the best method of vindicating the corporate claim, the representation requirement of Rule 23.1 is met." 65 F.R.D. at 554. Here, Daventree has vigorously prosecuted the interests of Oily Rock in the present suit and the adequate representation requirement of Rule 23.1 has been met.

Second, the Sovereign defendants' contention that Daventree is an inadequate representative due to Kozeny's alleged wrongdoing, including involvement in fraud, also fails because the allegedly related civil and criminal actions against Kozeny have not been fully adjudicated. As no finding against Mr. Kozeny by any court has been brought to this Court's attention, his alleged wrongdoings do not warrant dismissal of Daventree's derivative claims. Cf. *Maxwell v. Stein,* 93 Civ. 2830, 1993 WL 512907 at *5–6 (S.D.N.Y. Dec.3, 1993) (disqualifying shareholder from serving as the representative for corporation in a derivative action because that shareholder was an "adjudicated defrauder").

## D. The Equitable Defense of Unclean Hands Does Not Require Dismissal of Plaintiffs' Claims

The Sovereign defendants assert that the equitable doctrine of unclean hands warrants dismissal of plaintiffs' claims because plaintiffs' misfortunes sprang from their efforts to gain "an improper advantage over others [by choosing] to engage in fraudulent activities designed to tilt SOCAR's privatization in their favor." (Sovereign Defendants' Memorandum of Law at 18) However, the "doctrine of unclean hands is 'an equitable defense and unavailable in an action seeking money damages,'" as plaintiffs do here. *See Polin v. Wisehart & Koch,* 00 Civ. 9624, 2004 WL 1944721 at *5 (S.D.N.Y. Sep.2, 2004) (quoting *Nomura Securities Intern. Inc. v. E*Trade Securities, Inc.,* 280 F.Supp.2d 184, 196 (S.D.N.Y. 2003)); *see also PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488, 493 (2d Cir.2004). Accordingly, the Sovereign defendants are not entitled to dismissal of this action on the basis of that equitable doctrine.

## E. The Act of State Doctrine Does Not Apply

Defendants further urge this court to dismiss plaintiffs' complaints pursuant to the Act of State doctrine. The Act of State doctrine is derived from a policy of mutual respect for other nations' sovereignty and the appropriate roles of the judicial and executive branches of government:

"Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

*Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). As such, the Act of State doctrine "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Where adjudication of a claim would require a court to pass judgment on a foreign government's official act, redress must be achieved through diplomatic channels, not the courts. *See Republic of Austria v. Altmann,* 541 U.S. 677, 124 S.Ct. 2240, 2254 n. 20, 159 L.Ed.2d 1 (2004).

Defendants assert in their motion to dismiss that both the FSIA and the Act of State doctrine warrant dismissal for lack of subject matter jurisdiction. *See* Def. Mem. Supp. Mot. Dismiss at 3. This argument ignores a crucial distinction between the two principles. Unlike an assertion of sovereign immunity, which raises a jurisdictional defense, "the Act of State doctrine provides a substantive defense on the merits." *See Altmann,* 124 S.Ct. at 2254. In other words, application of the doctrine is not a denial of jurisdiction, *see Bigio v. Coca–Cola Co.,* 239 F.3d 440, 452 (2d Cir. 2000) ("[The Act of State doctrine] does not deprive the courts of jurisdiction once acquired over a case"), but rather requires an exercise of it. *See Altmann,* 124 S.Ct. at 2254 (holding that Act of State doctrine precludes judgment "even when such courts have jurisdiction over a controversy"); *Bigio,* 239 F.3d at 452 n. 6 ("To accept a ruling authority and to decide accordingly is not a surrender or abandonment of jurisdiction but is an exercise of it.") (quoting *Ricaud v. American Metal Co.,* 246 U.S. 304, 309, 38 S.Ct. 312, 62 L.Ed. 733 (1918)). Once jurisdiction obtains, the Act of State doctrine requires courts to accept, as a rule for their decision, that the acts of foreign sovereigns taken within the foreign borders are valid. *See W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 409, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) ("The Act of State doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid.").

The burden of establishing that the conduct of a foreign government amounts to an Act of State rests with the party asserting the defense. *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Once raised, the court will make a legal determination as to whether or not adjudication of the plaintiff's claims requires an inquiry into the validity of sovereign acts. At the motion to dismiss stage, such a determination of the availability of an affirmative defense must be made on the basis of the pleadings alone. *See Official Comm. of Unsecured*

*Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir.2003); *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d. Cir. 1996). Where, as here, the facts necessary to give rise to the affirmative defense are not contained within the four corners of the complaint, it is premature to rule on the motion.[4] *See Jungquist v. Nahyan*, 940 F.Supp. 312, 318–19 (D.D.C.1996), *rev'd on other grounds*, 115 F.3d 1020 (D.C.Cir.1997) (to dismiss on the basis of an Act of State doctrine defense, "the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state").

As a substantive rather than a jurisdictional defense, the Act of State doctrine is more appropriately raised in a motion for summary judgment than in a motion to dismiss. *See Lyondell–Citgo Refining, LP v. Petroleos de Venezuela, S.A.*, 02 Civ. 0795, 2003 WL 21878798 at *4–8 (S.D.N.Y. Aug.8, 2003). Accordingly, this court cannot determine whether or not defendants' acts are protected by the Act of State doctrine in the absence of a fuller record.

### F. Dismissal for Forum Non Conveniens Is Not Warranted

 The Sovereign defendants maintain that the claims against them should be dismissed on grounds of forum non conveniens. Whether an action should be dismissed pursuant to the doctrine of forum non conveniens is a discretionary determination, *see Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir. 2000), which involves two steps: (1) determining whether an adequate alternative forum for the dispute exists; and (2) balancing the public and private interest factors enumerated by the United States Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), to determine "whether the convenience of the parties and the ends of justice would best be served by dismissing the action."[5] *See Murray v. British Broadcasting Corp.*, 81 F.3d 287, 293 (2d Cir.1996). Only if an adequate forum is found will the court proceed to the balancing test in the second step. *See Wiwa*, 226 F.3d at 99.

 An alternate forum will be considered adequate if: (1) defendants are subject to service of process there; and (2) the forum permits a satisfactory remedy. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The defendant has the burden to establish that an adequate alternative forum exists. *See Wiwa* 226 F.3d at 100. As the Court of Appeals for the District of

---

4. For example, the Act of State doctrine only applies to valid acts of state. Yet plaintiffs allege several illegitimate state actions, including kidnapping and extortion. Therefore, the Act of State defense does not appear on the face of the complaint, and the court cannot resolve the appropriateness of its application absent additional information.

5. The set of public interest factors include: (1) administrative difficulties flowing from court congestion, (2) the local interest in having controversies decided at home, (3) the interest in having the trial in a forum that is familiar with the law governing the action, (4) the avoidance of unnecessary problems in conflict of laws or in the application of foreign law, (5) and the unfairness of burdening citizens in an unrelated forum with jury duty; while the list of public interest factors include: (1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling and the cost of obtaining attendance of willing witnesses, (3) the possibility to view of premises at issue, if such views are relevant, and (4) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *See Murray*, 81 F.3d at 293.

Columbia Circuit observed in *El–Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C.Cir.1996), a foreign forum "is not inadequate merely because it has less favorable substantive law," "employs different adjudicative procedures," or is subject to "general allegations of corruption." *See id.* at 678. On the other hand, if a foreign court were likely to foreclose a plaintiff's ability to pursue his or her claims, then "dismissal on *forum non conveniens* grounds [would be] inappropriate." *See id.*

As a preliminary matter, the Sovereign defendants present an affidavit of an Azeri legal expert to support their contention that the Azeri courts constitute an adequate alternative forum. That expert, Roman Alloyarov, describes the formal dispute resolution framework in Azerbaijan and avers both as to the availability of adequate relief for plaintiffs' claims and as to the independence of the Azeri judiciary. (Alloyarov Decl. ¶ 12–28). In response, plaintiffs point to a 2000 article co-authored by Mr. Alloyarov that described the Azeri Economic Court—the court that the parties agree would hear this complaint—as infected with "an inherent national bias ... as well as rampant corruption and judicial inexperience." (Bowring Decl., Ex. 2).

While Alloyarov's conflicting statements undermine the credibility of his endorsement of the impartiality of the Azeri legal system, they are nonetheless insufficient by themselves to render the Azeri courts an inadequate forum. *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002). More troubling, however, are plaintiffs' expert's assertions as to the extent of control wielded by the executive branch of the Azeri government—a party to this litigation—over the Azeri courts. (Bowring Decl. at ¶ 32–33 and Ex. 3). In contrast with general allegations of corruption, the possibility that the Sovereign defendants could dictate the outcome of this dispute through their control over Azeri courts would effectively foreclose the plaintiffs' right to pursue their claims and render the Azerbaijan courts an inadequate forum. Cf. *Aguinda*, 303 F.3d at 478 (noting the absence of any evidence that Texaco, the defendant, exercised any improper control over the judicial process in Ecuador). Because the Sovereign defendants have failed to adduce evidence to refute the likelihood of such a scenario—and indeed, as noted above, their own expert wrote as recently as four years ago that the relevant Azeri court exhibited "national bias" and "rampant corruption," they have not met their burden of demonstrating that Azerbaijan is as an adequate alternative forum.

Moreover, even if Azerbaijan were an adequate forum for this action, a balancing of the private and public interest factors enumerated by the Supreme Court in *Gilbert* counsels against dismissal on the grounds of forum non conveniens. Public interest ordinarily favors the enforcement of the federal law, such as the RICO statutes, in the United States courts. *See e.g., Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1002 (2d Cir.1993) (public interest favors enforcing federal securities laws in domestic courts); *Capital Currency Exchange, N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 611–12 (2d Cir.1998) (same for federal antitrust laws). While the public interest in favor of domestic enforcement of federal laws is seldom determinative, *see Alfadda v. Fenn*, 159 F.3d 41, 47 (2d Cir.1998), additional private interest factors, such as plaintiffs' choice of forum and the uncertainty of plaintiffs' ability to compel the testimony of unwilling witnesses, including officials of the Azeri government, also counsel in favor of the retention of this action before this Court. On balance, those factors out-

weigh the interests, such as the ease of access to proof, that favor dismissal.

Therefore, because the Azeri courts do not constitute an adequate alternative forum in the context of this litigation and because the balancing of public and private interest also favors retention of this action, dismissal of plaintiffs' remaining claims against the Sovereign defendants on the grounds of forum non conveniens is not warranted.

## III. HYPOSWISS DEFENDANTS' MOTION TO DISMISS

The Hyposwiss defendants seek to dismiss the claims asserted against them on numerous grounds, including lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, because they are neither citizens nor residents of either New York or the United States. Personal jurisdiction will be addressed at the outset because it "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas,* 526 U.S. at 584, 119 S.Ct. 1563.

Because this Court finds that no basis exists for the exercise of personal jurisdiction over the individual defendants Horath and Buchmann, their motion to dismiss is granted and all claims will be dismissed as against those defendants. On the other hand, an issue of jurisdictional fact exists as to whether the court may exercise general jurisdiction over Privatbank pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Accordingly, its motion to dismiss is denied without prejudice as to the RICO and ATCA claims, pending jurisdictional discovery.

### A. Legal Standards

1. *Dismissal for Lack of Personal Jurisdiction*

To withstand a motion to dismiss for lack of personal jurisdiction, plaintiffs bear the burden of showing that this Court has jurisdiction over the Hyposwiss defendants. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996). The onus plaintiffs must discharge "varies with the procedural posture of the case." *See Norvel Ltd. v. Ulstein Propeller AS,* 161 F.Supp.2d 190, 199 (S.D.N.Y.2001). As no jurisdictional discovery has taken place in this action, plaintiffs need only rely on "legally sufficient allegations for jurisdiction." *See Metropolitan Life,* 84 F.3d at 566. The court accepts plaintiffs' allegations of jurisdictional facts and will construe all factual inferences in their favor. *See In re. Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir.2003) (*per curiam*); *777388 Ontario Ltd. v. Lencore Acoustics Corp.,* 142 F.Supp.2d 309, 317 (E.D.N.Y. 2001). It need not, however, accept a legally conclusory assertion or draw "argumentative inferences." *See Mende v. Milestone Technology, Inc.,* 269 F.Supp.2d 246, *251 (S.D.N.Y.2003) (citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994)).

Plaintiffs do not contend that the Hyposwiss defendants, who are citizens of Switzerland, have a history of sufficiently "continuous and systematic" contacts with New York to subject them to general jurisdiction in this state. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir.2002) (*"Bank Brussels Lambert II"*). Thus, in undertaking the jurisdictional analysis over the Hyposwiss defendants, this Court looks first to the relevant provisions of the New York long-arm statute to determine whether personal jurisdiction exists over those defendants under New York law. *See Fort Knox Music Inc. v. Baptiste,* 203 F.3d 193, 196 (2d Cir.2000) (citing *Omni Capital International, Ltd. v. Rudolf Wolff*

*& Co.,* 484 U.S. 97, 103–05, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987)). If personal jurisdiction in New York is lacking on that basis,[6] this Court will then engage in a Rule 4(k)(2) analysis and examine the extent of the Hyposwiss defendants' contacts with the United States as a whole to determine whether the exercise of personal jurisdiction comports with the requirements of the Due Process clause of the Fifth Amendment to the United States Constitution. *See Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.,* 956 F.Supp. 427, 438–39 (S.D.N.Y.1996); *Norvel,* 161 F.Supp.2d at 199.

### 2. *Personal Jurisdiction pursuant to the New York Long–Arm Statute*

Plaintiffs assert that jurisdiction exists over the Hyposwiss defendants pursuant to two distinct provisions of New York's long-arm statute: C.P.L.R. § 302(a)(1), which permits the exercise of personal jurisdiction over a defendant who has transacted business in New York; and C.P.L.R. § 302(a)(2), which permits the exercise of jurisdiction over a defendant who has committed a tortious act within New York. In determining the sufficiency of the Hyposwiss defendants' contacts with New York to justify the exercise of personal jurisdiction, plaintiffs urge this Court to consider both the direct conduct of the Hyposwiss defendants and, under an "agency" theory, the activities of their putative co-conspirators.

#### a. *CPLR § 302(a)(1)—Transacting Business within New York*

▇▇ A court may exercise personal jurisdiction over the Hyposwiss defendants pursuant to CPLR § 302(a)(1) if those defendants or their agents have "transact[ed] any business within [New York]" and if claims asserted here "arise from those business transactions." *See Sunward Electronics, Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir.2004). Many factors are relevant for determining whether the Hyposwiss defendants' contacts with New York constitutes "transacting business" within the meaning of CPLR § 302(a)(1); none is, however, dispositive. *See Sunward Electronics,* 362 F.3d at 22 (2d Cir. 2004) (enumerating list of relevant factors); *see also, Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 787 (2d Cir.1999) (*"Bank Brussels Lambert I"*). Instead, a court must examine the "totality of circumstances" of the alleged activities of the Hyposwiss defendants or of their putative agents or co-conspirators to determine the applicability of CPLR § 302(a)(1). *See Bank Brussels Lambert I,* 171 F.3d at 787 (citing *Peekskill Community Hosp. v. Graphic Media, Inc.,* 198 A.D.2d 337, 338, 604 N.Y.S.2d 120 (2d Dep't 1993)).

#### b. *CPLR § 302(a)(2)—Commission of a Tortious Act within New York*

▇▇ Personal jurisdiction in New York exists over the Hyposwiss defendants pursuant to CPLR § 302(a)(2) if they or their agents "commit[ed] a tortious act within the state." *See* C.P.L.R. § 302 (McKinney 2003). While CPLR § 302(a)(2) does not require a specific level of contacts with New York by the Hyposwiss defendants, there are two prerequisites for its application: first, the alleged tort must be committed by a defendant or an agent when "[he or she] was physically present in New

---

**6.** Because plaintiffs have only sought to show the existence of personal jurisdiction over the Hyposwiss defendants in New York, the failure to make such a showing suffices to fulfill the last prong of the requirements for Rule 4(k)(2)'s application—that defendants are "not subject to the jurisdiction of the courts of general jurisdiction of any state." *See* Fed. R.Civ.P. 4(k)(2).

York," *see Bensusan Restaurant Corp.*, 126 F.3d at 28; second, the claims asserted against the Hyposwiss defendants must "arise from the tortious act" alleged. *See Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295, 299 (S.D.N.Y.1996), *aff'd* 126 F.3d 25 (2d Cir.1997) (internal citations omitted); *Millennium, L.P. v. Dakota Imaging, Inc.*, 03 Civ. 1838, 2003 WL 22940488 at *5 (S.D.N.Y. Dec.15, 2003) (holding that an exercise of jurisdiction pursuant to section 302(a)(2) requires "the plaintiff to suffer some damages as a result of the tortious act committed").

### c. *Imputation of a Co-conspirator's Contacts with New York*

■■ The plain language of CPLR § 302(a) provides for the exercise of personal jurisdiction over a defendant on the basis of the acts of that defendant "in person or through an agent." *See* C.P.L.R. § 302(a). Plaintiffs are not required to establish the existence of "a formal agency relationship" between the Hyposwiss defendants and their putative co-conspirators to impute the latter's contacts with New York to the former. *See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir.2001) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988)); *Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 11, 681 N.Y.S.2d 748, *aff'd* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1st Dep't 1998) (holding that "for purpose of [CPLR § 302(a)(2) ], a co-conspirator can be an agent"). The court may exercise personal jurisdiction over the Hyposwiss defendants based on the acts of their putative co-conspirators if plaintiffs have alleged facts sufficient (1) to establish a *prima facie* case of conspiracy, (2) to warrant the inference that the Hyposwiss defendants were members of that conspiracy, (3) to demonstrate that a putative co-conspirator committed a tort or transacted business within New York within the meaning of CPLR § 302(a)(1) or (a)(2), and (4) to justify the finding of an agency relationship between the putative co-conspirator acting in New York and the Hyposwiss defendants. *See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 394 (S.D.N.Y.2002) (citing *Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 119–120 (E.D.N.Y.2000)); *see also, Dixon v. Mack*, 507 F.Supp. 345, 349–50 (S.D.N.Y.1980).

■■■ To plead conspiracy under New York law, a plaintiff must allege the underlying tort and four elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *See Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1267 (S.D.N.Y.1991) (citing *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir.1986)). Moreover, to find the existence of an agency relationship, this Court must be satisfied that plaintiffs have sufficiently alleged that "(a) the [Hyposwiss defendants] had an awareness of the effects in New York of its [putative co-conspirators'] activities; (b) the activity of the co-conspirator was to the benefit of the [Hyposwiss defendants]; and (c) the co-conspirator acting in New York acted at the direction or under the control, "at the request or on behalf of" or with the knowledge and consent of the Hyposwiss defendants. *See First Capital Asset Mgmt., Inc.*, 218 F.Supp.2d at 394 (internal quotations omitted); *see also, Dixon*, 507 F.Supp. at 351–52 (holding that a defendant's knowing ratification of a co-conspirator's activity suffices to establish the requisite agency relationship).

Whether an alleged conspiracy or a putative agency relationship existed is "a mixed question of law and fact." *See Mario Valente Collezioni, Ltd.*, 264 F.3d at 36. Therefore, this Court cannot accept plaintiffs' conclusory assertions on those issues; instead, it must resolve such questions based upon an independent examination of the factual allegations while mindful of its duty to draw all factual inferences in plaintiffs' favor. *See First Capital Asset Mgmt., Inc.*, 218 F.Supp.2d at 395 (granting motion to dismiss for lack of personal jurisdiction because plaintiffs advanced only "the most conclusory" assertions of control by a defendant over her putative agent without any support of "specific factual allegations"); *777388 Ontario Limited v. Lencore Acoustics Corp.*, 142 F.Supp.2d 309, 319 (E.D.N.Y.2001) (noting that "bland assertion" of a conspiracy or agency is insufficient to establish jurisdiction) (internal quotation omitted).

3. *Personal Jurisdiction pursuant to Rule 4(k)(2)*

 Rule 4(k)(2) is designed to "fill a gap in the enforcement of federal law" for courts to exercise personal jurisdiction over defendants "having sufficient contacts with the United States to justify the application of United States law . . . but having insufficient contact with any single state to support jurisdiction under state long-arm legislation." *See United States v. Int'l Brotherhood of Teamsters*, 945 F.Supp. 609, 616–17 (S.D.N.Y.1996) (quoting Fed. R.Civ.P. 4(k)(2), advisory committee's note (1993)). For a court to exercise personal jurisdiction over the Hyposwiss defendants pursuant to Rule 4(k)(2), three prerequisites must be met: (1) one or more of the claims asserted against those defendants arises under federal law; (2) personal jurisdiction does not exist over those defendants in New York or another state; and (3) sufficient contacts with the United

States, as a whole, exist to satisfy the requirements of the due process clause of the Fifth Amendment. *See id.*, 945 F.Supp. at 617; *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1126 (9th Cir.2002).

Because plaintiffs have asserted federal civil RICO and ATCA claims against the Hyposwiss defendants and because this Court finds that long-arm jurisdiction in New York is lacking, *see*, part III.B.1, *infra*, the existence *vel non* of personal jurisdiction over those defendants pursuant to Rule 4(k)(2) turns on the requirements of due process. Due process requires plaintiffs to allege jurisdictional facts sufficient to establish first, that the Hyposwiss defendants had "sufficient contacts" with [the United States as a whole] to justify the court's exercise of personal jurisdiction—known as the "minimum contacts" inquiry; and second, that asserting personal jurisdiction in light of the circumstances of this action "comports with 'traditional notions of fair play and substantial justice' "—the so-called "reasonableness" inquiry. *See Metropolitan Life Ins' Co.*, 84 F.3d at 568 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *Aerogroup Int'l, Inc.*, 956 F.Supp. at 439 n. 16 (S.D.N.Y.1996) (basing the Fifth Amendment due process analysis on precedents that address due process requirements of the Fourteenth Amendment).

a. *Minimum Contacts*

 Depending on the relationship between the claims asserted the defendant, on one hand, and the substance of a defendant's contacts with the United States, on the other, two distinct standards apply to evaluate whether those contacts are sufficient to justify a court's exercise of personal jurisdiction pursuant to Rule 4(k)(2): one inquiry—the specific jurisdiction inqui-

ry—focuses on the contacts directly relevant to the claims asserted against that defendant; the other inquiry—the general jurisdiction inquiry—looks to the totality of the defendant's contacts and "permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *See Metropolitan Life Ins. Co.,* 84 F.3d at 567–68 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Existence of general jurisdiction requires a defendant to have "continuous and systematic general business contacts" and demands the application of "a more stringent minimum contacts test than that applicable to specific jurisdiction." *See Aerogroup Int'l, Inc.,* 956 F.Supp. at 439 (quoting *Metropolitan Life Ins. Co.,* 84 F.3d at 568).

### b. Reasonableness

Once a court determines that there are adequate minimum contacts with the United States, the court must then determine whether it is "reasonable" to exercise jurisdiction. That latter inquiry examines the following factors:

"(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."

*Metropolitan Life Ins. Co.,* 84 F.3d at 568 (citing *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 113–14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). Balancing the outcomes of the minimum contacts analysis and reasonableness inquiry is a nuanced and fact-specific exercise. *See id.* 84 F.3d at 568–569 (noting that although the exercise of personal jurisdiction is typically "favored" upon a showing of sufficient minimum contacts, such a showing may be "defeated [by] a compelling case that the presence of some other considerations would render jurisdiction unreasonable") (internal quotations omitted).

### 4. Entitlement to Jurisdictional Discovery

▇▇▇▇ It is within a district court's discretion to determine whether a plaintiff is entitled to conduct jurisdictional discovery and to "devis[e] the procedures [to] ferret out the facts pertinent to jurisdiction." *See APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003). A plaintiff should be provided with " 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction' " through jurisdictional discovery. *See id.* (quoting *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C.Cir.2000)). If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 207–08 (2d Cir.2003) (*per curiam*). However, a court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts, construed most favorably in the plaintiff's favor, fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction. *See Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 185–86 (2d Cir.1998); *APWU,* 343 F.3d at 627.

### B. Analysis

#### 1. The Hyposwiss Defendants Are Not Subject to Long–Arm Jurisdiction in New York

▇▇▇ For the sake of clarity, this Court will begin its jurisdictional analysis by fo-

cusing on the Hyposwiss defendants' own conduct and then turn to the activities of the putative co-conspirators.

### a. CPLR §§ 302(a)(1) and 302(a)(2) Do Not Apply to the Hyposwiss Defendants Directly

Plaintiffs do not allege that either Horath or Buchmann was physically present in New York in connection with the events alleged in the Complaint. Nor have plaintiffs made those allegations in regard to any other employee of Privatbank. There is, accordingly, no basis for asserting jurisdiction over those defendants pursuant to CPLR § 302(a)(2), which only applies to the commission of a tort by a defendant physically present in New York. *See Bensusan Restaurant Corp.,* 126 F.3d at 29 (citing *Feathers v. McLucas,* 15 N.Y.2d 443, 460, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965)); *In re Sumitomo Copper Litig.,* 120 F.Supp.2d 328, 338 (S.D.N.Y.2000).

Plaintiffs allege that defendant Privatbank maintained a correspondent bank account in New York, through which funds were transferred in connection with the alleged racketeering scheme. (Compl. at 115–118) Plaintiffs, relying on *Correspondent Services Corp. v. J.V.W. Investments Ltd.,* 120 F.Supp.2d 401 (S.D.N.Y.2000), assert that that degree of contact with New York is sufficient to subject the Hyposwiss defendants to personal jurisdiction pursuant to CPLR § 302(a)(1).

Such a reading, however, saddles the holding in *Correspondent Services Corp.* with an unwarranted breadth. Contrary to plaintiffs' suggestion, the bank account in *Correspondent Services Corp.* was used by a defendant bank to transact business on its own behalf with a plaintiff in that action and was thus "at the very roots of the action in this case." *See id.,* 120 F.Supp.2d at 405. No such allegations are present here. Plaintiffs' allegations better

resemble the jurisdictional facts present in *Leema Enterprises, Inc. v. Willi,* 575 F.Supp. 1533 (S.D.N.Y.1983), where another court in this district found the "mere maintenance of correspondence bank accounts to facilitate international financial transactions or money transfers" insufficient to establish personal jurisdiction. *See id.,* at 1537; *see also, Neewra, Inc. v. Manakh Al Khaleej General Trading and Contracting Co.,* 03 Civ. 2936, 2004 WL 1620874 at *3–4 (S.D.N.Y., Jul.20, 2004).

### b. Acts of Putative Co-conspirators Cannot Be Imputed to Hyposwiss Defendants

Plaintiffs also urge this Court to exercise personal jurisdiction over the Hyposwiss Defendants based on acts of two groups of their putative co-conspirators: two Azeri officials—individual defendants Nasibov and Nuriyev—who allegedly traveled to New York in March 1998 to solicit investment in SOCAR's privatization, (Compl. at ¶¶ 108–12), and defendant Bodmer, who allegedly "traveled frequently in interstate and foreign commerce from various places, [including] New York City ... for meetings with defendants, to solicit investors, and to take actions to further assist the illegal and corrupt scheme." (*Id.* at ¶ 34) Those activities, according to plaintiffs, suffice to extend long-arm jurisdiction over Nasibov, Nuriyev, and Bodmer pursuant to either CPLR § 302(a)(1) or § 302(a)(2). Plaintiffs further assert that those putative co-conspirators' acts can be attributed to the Hyposwiss defendants under an "agency" theory.

Before this Court examines the sufficiency of the putative co-conspirators' contacts with New York for long-arm jurisdiction purposes, it must first address the preliminary question of whether the imputation of those acts to the Hyposwiss defendants is warranted. Here, the factual

allegations as to the existence of an agency relationship are insufficient.

First, plaintiffs assert that that the Hyposwiss defendants "were integral members" of the RICO enterprise alleged. (Plts. Opp. Mem. at 7). However, as noted above, such a conclusory assertion of membership is insufficient to establish the existence of the requisite agency relationship. *See First Capital Asset Mgmt., Inc.*, 218 F.Supp.2d at 395; *777388 Ontario*, 142 F.Supp.2d at 319. The complaint does not allege that the Hyposwiss defendants directed, controlled, or requested the Azeri defendants or Bodmer to travel to New York for the solicitation of investments in SOCAR. Nor is there any specific allegation as to their knowledge of, or consent to, the conduct of those solicitations by the Azeri defendants or by Bodmer.[7] Thus, plaintiffs have failed to allege facts sufficient for the existence of an agency relationship between the Hyposwiss defendants and the putative co-conspirators acting in New York. *See First Capital Asset Mgmt., Inc.*, 218 F.Supp.2d at 394–95; cf., *Dixon*, 507 F.Supp. at 351–52 (finding the existence of agency relationship based on specific allegations of a defendant's knowledge and ratification of co-conspirators' activities in New York); *Simon*, 86 F.Supp.2d. at 123 (finding the existence of agency relationship based on specific evidence that a foreign defendant had knowledge of, and provided counsel to, a co-conspirator in connection with a course of tortious conduct in New York and other states).

In sum, because neither CPLR § 302(a)(1) nor § 302(a)(2) confers power upon this Court to exercise jurisdiction over the Hyposwiss defendants on the basis of their own actions and because there is no basis to impute the conduct of their putative co-conspirators to Hyposwiss defendants, this Court concludes the exercise of long-arm jurisdiction over the Hyposwiss defendants is proscribed by New York law.

2. *Hyposwiss Defendants Are Not Subject to Specific Jurisdiction Pursuant to Rule 4(k)(2)*

In light of the above determination that New York long-arm jurisdiction does not reach the Hyposwiss defendants and because federal RICO claims are at issue, it remains to determine the appropriateness of exercising personal jurisdiction over those defendants pursuant to Rule 4(k)(2).

First, this Court will address whether specific jurisdiction exists on the basis of the Hyposwiss defendants' activities in or affecting the United States that arise out of or relate to the claims asserted here. *See Aerogroup Int'l, Inc.*, 956 F.Supp. at 440. Exercise of personal jurisdiction is appropriate if this Court finds that the Hyposwiss defendants "purposefully directed [their] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or related to those activities." *See Norvel Ltd.*, 161 F.Supp.2d at 206. Plaintiffs have alleged that on several occasions, the Hyposwiss defendants received wire transfers of funds from the United States and made wire transfers to accounts in the United States on behalf of their clients in connection with the alleged racketeering scheme. (Compl. at ¶¶ 68–72, 97–98, 113–123). Plaintiffs further allege that, at Oily Rock's bidding, defendant Privatbank "request[ed] the Federal Reserve Bank in the

---

7. The only allegation of the Hyposwiss defendants' knowledge of an illegal activity is that they transmitted "hundreds of millions of dollars in cash, and by wire transfers, from Oily Rock to the Azeri defendants and their agents and, upon information and belief, knowing that the money they were transferring had been stolen from Oily Rock." (Compl. at 68)

United States [to] transfer currency from locations within the United States to Zurich[,] Switzerland, where such funds could then be transported by agent or other means to Baku, Azerbaijan ..." (*Id.* at ¶ 181(a))

Although the Second Circuit has not addressed whether the requirements of minimum contacts may be satisfied by a foreign bank's performance of wire transfers on behalf of its clients, other district courts in this Circuit have addressed similar circumstances and found them deficient. *See* e.g., *Baptichon v. Nevada State Bank,* 304 F.Supp.2d 451, 462–63 (E.D.N.Y.2004) (holding that, under the Fourteenth Amendment, due process proscribes extending personal jurisdiction over a nonresident bank solely on the basis of its acceptance and cashing of the plaintiff's check). Courts of Appeals for other circuits have, similarly, held that the making of wire transfers or accepting checks did not suffice as "minimum contacts" to subject a non-resident bank to jurisdiction. *See* e.g., *Soma Med. Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1298–99 (10th Cir.1999); *T.J. Raney & Sons, Inc. v. Security S & L Assoc. of Salina, Kansas,* 749 F.2d 523, 525 (8th Cir.1984); *Dollar Savings Bank v. First Security Bank of Utah,* 746 F.2d 208, 213–14 (3rd Cir.1984). As the court recognized in *Baptichon,* the norm of "fundamentals of substantial justice" does not accord with a finding of minimum contacts where a non-resident bank engages in wire transfers or cash withdrawals on behalf of its clients as part of the financial process. *See id.,* 304 F.Supp.2d at 463.

Plaintiffs also implore this Court to consider the activities of the Hyposwiss defendants' putative co-conspirators in the United States in gauging those defendants' aggregate contacts with this country. Whether a plaintiff can establish personal jurisdiction over a defendant pursuant to Rule 4(k)(2) through the imputation of contacts of that defendant's putative co-conspirators with the United States has not been addressed extensively. One district court recently rejected a "conspiracy theory of jurisdiction." *See In re New Motor Vehicles Canadian Export,* 307 F.Supp.2d 145, 158 (D.Me.2004). Other courts, on the other hand, have approved such a theory in their analysis of whether assertion of state long-arm jurisdiction on the basis of co-conspirators' conduct comports with the requirements of Fourteenth Amendment due process. *See* e.g., *Simon,* 86 F.Supp.2d at 127 (noting a split among courts and academic commentators).

This Court needs not resolve that question, however, because even assuming the validity of a conspiracy theory of jurisdiction under Rule 4(k)(2), plaintiffs' allegations of jurisdictional facts are insufficient to impute to the Hyposwiss defendants the United States contacts of their putative co-conspirators. As set forth above, plaintiffs have not alleged facts sufficient to establish the requisite agency relationship. Cf. *In re Lupron Marketing and Sales Practices Litig.,* 245 F.Supp.2d 280, 293–94 (D.Mass.2003) (holding that due process "requires more than a bare allegation of the existence of a conspiracy" to impute the conduct of an alleged co-conspirator to a defendant).

In sum, because the Court finds plaintiffs' factual allegations regarding the Hyposwiss defendants' wire transfers and cash transfer do not suffice to demonstrate the existence of "minimum contacts" under due process clause of the Fifth Amendment, Rule 4(k)(2) does not permit the exercise of specific jurisdiction over those defendants. Moreover, as plaintiffs have not adduced any allegations that individual defendants Horath and Buchmann maintained a course of "continuous or systematic" contacts with the United States to sus-

tain general jurisdiction over them, all claims asserted against those individual defendants are dismissed for lack of personal jurisdiction.

### 3. Plaintiffs Are Entitled to Jurisdictional Discovery as to Privatbank's Investing Activities in the United States

Plaintiffs point out that Privatbank's website and its 2001 Annual Report state that Privatbank engages in transactions involving securities issued in the United States. (2001 Annual Report at 3, attached to Affidavit of Frances E. Bivens at Exhibit B). There is no allegation that transactions are related to the claims asserted here. Accordingly, they are only relevant to this Court's determination of whether the exercise of general jurisdiction over Privatbank is warranted pursuant to Rule 4(k)(2) for having such "continuous and systematic general business contacts" with the United States. *See Aerogroup Int'l, Inc.*, 956 F.Supp. at 439.

Because plaintiffs have identified a genuine issue of jurisdictional fact, the question of general jurisdiction cannot be resolved on the pleadings and affidavits alone. Thus, plaintiffs are entitled to jurisdictional discovery regarding the extent of defendant Privatbank's general business contacts with the United States in the years 1992—1998, a period that includes the relevant period in this action and five preceding years. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 207–08; *see also, Metropolitan Life Ins. Co.*, 84 F.3d at 569–70 (holding that the time period relevant for determining extent of a defendant's contacts for general jurisdiction purpose should include a number of years prior to the events giving rise to the claims asserted).

## IV. CONCLUSION

For the reasons set forth above, the Sovereign defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' claims alleging takings in violation of international law, promissory estoppel, equitable estoppel, and unjust enrichment— counts seven, nine, and ten in the complaint—are hereby dismissed as against the Sovereign defendants. In addition, the motion of individual defendants Horath and Buchmann to dismiss the complaint for lack of personal jurisdiction is granted and all claims asserted against those defendants are hereby dismissed.

Because this Court finds that an issue of jurisdictional fact exists as to the existence of general jurisdiction pursuant to Rule 4(k)(2) as to corporate defendant Privatbank, its motion to dismiss is denied without prejudice to its renewal pending conclusion of jurisdictional discovery on that issue.